The document below is hereby signed.

Signed: September 6, 2013



_S. Martin Teel Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| GOLD & APPEL TRANSFER S.A., | ) | Case No. 05-00775 |
| | ) | (In a Case Under Section |
| Debtor in a Foreign | ) | 304 of the Bankruptcy Code) |
| Proceeding. | ) | |
| _____ | ) | |
| | ) | |
| MEADE MALONE, OFFICIAL | ) | |
| LIQUIDATOR FOR GOLD & APPEL | ) | |
| TRANSFER S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. |
| | ) | 05-10022 |
| ICEBERG TRANSPORT S.A., _et_ | ) | |
| _al._, | ) | Not for publication in |
| | ) | West's Bankruptcy Reporter |
| Defendants. | ) | |

MEMORANDUM DECISION RE MOTION FOR PARTIAL SUMMARY JUDGMENT
WITH RESPECT TO PROPERTY TRANSFERRED FROM GOLD &
APPEL TRANSFER S.A. TO WALTER ANDERSON, THE FOUNDATION
FOR THE INTERNATIONAL NONGOVERNMENTAL DEVELOPMENT
OF SPACE, ICEBERG TRANSPORT SA, COMVERGE, LTD. AND SPACE INC.

Gold & Appel Transfer S.A. is a British Virgin Islands

corporation that is in an insolvency proceeding in the British

Virgin Islands.  On May 16, 2005, pursuant to section 304 of the

Bankruptcy Code (11 U.S.C.), as then in effect,[1] Meade Malone,

Official Liquidator for Gold & Appel in its insolvency

proceeding, commenced a case here regarding Gold & Appel, Case

No. 05-00775, ancillary to the British Virgin Islands insolvency

proceeding.   Malone then commenced this adversary proceeding in

this court to reach various assets.

From its initial formation and until the commencement of the

insolvency proceedings, Gold & Appel was controlled by Walter

Anderson, through various straw entities.   Anderson struck it

rich as a telecommunications entrepreneur.   Anderson used Gold &

Appel as a vehicle, wholly controlled by him, to evade reporting

and paying United States income taxes.   Anderson has been

convicted of tax fraud for filing income tax returns that failed

to report more than $364 million in investment-type income from

Gold & Appel on his income tax returns with respect to the years

1998 and 1999.   *See Anderson v. Comm'r*, 698 F.3d 160, 165 (3d

Cir. 2012), *cert. denied*, 2013 WL 705914 (June 10, 2013).   Income

tax deficiencies asserted by the Internal Revenue Service for

those years have been upheld.   *Id.*

Gold & Appel invested in numerous entities.   Among the

---

[1]   Section 802 of the Bankruptcy Abuse Prevention and
Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23
(Apr. 20, 2005) repealed 11 U.S.C. § 304 effective for cases
filed on or after October 17, 2005.   In place of § 304, that Act
added to the Bankruptcy Code a chapter 15 (Ancillary and Other
Cross-Border Cases) effective for cases filed on or after October
17, 2005.

companies in which Gold & Appel held interests were:

- Asia Access Telecom, Inc. ("AAT");

- Communications Telesystems International, doing business as WorldxChange; and

- Panztel, Ltd.

When Gold & Appel was unable timely to pay obligations owed to creditors, Gold & Appel transferred ownership of those interests (and certain other properties) to Comverge Ltd., another entity wholly controlled by Anderson, pursuant to an *Agreement in Relation to Re-Organization of Private Funds* dated April 5, 2003 (the "*Reorganization Agreement*"). Incident to the same *Reorganization Agreement*, Gold & Appel transferred other properties to Iceberg Transport S.A., and Space Incorporated. Like Comverge, Iceberg and Space were exclusively controlled by Anderson.

By a motion for partial summary judgment, Malone seeks to avoid the transfers to Comverge, Iceberg, and Space of some of those assets (specifically, those he calls the "Transferred Assets") as fraudulent conveyances, and seeks to have the Transferred Assets (or their fruits) returned to and re-vested in him as Official Liquidator for Gold & Appel.[2] What appear to be

---

[2] Malone does not include as part of the Transferred Assets he seeks to recover paintings that Gold & Appel (transferred to Space under the *Reorganization Agreement*) and interests in certain entities transferred under the *Reorganization Agreement*. See n.50, *infra*.

the more significant Transferred Assets were conveyed to Comverge:

- $526,000 in proceeds of the sale of 83,136 shares of common stock in AAT ("the AAT shares");

- no less than $2,097,057.96 in cash held by a law firm in escrow and representing proceeds realized from Gold & Appel's claims against various parties in connection with its investment in WorldxChange; and

- 216,713 shares of stock in Panztel, Ltd.

Comverge, Iceberg, and Space have not filed oppositions to the motion.

In addition, Malone's motion seeks a determination that certain liens on the Transferred Assets were released or are avoidable as fraudulent conveyances. To elaborate, prior to the transfer of the Transferred Assets to Comverge, Iceberg, and Space, Gold & Appel had granted liens on the Transferred Assets to Walter Anderson and to another entity Anderson formed and controlled, Foundation for the International Non-Governmental Development of Space ("FINDS"), to secure debts allegedly owed them by Gold & Appel. FINDS' lien, if extant, includes as collateral the $2,097,057.96 related to WorldxChange; Anderson's lien, if extant, includes as collateral the AAT shares (for which the sales proceeds are $526,000) and the Panztel, Ltd. shares of an unknown value.

Anderson has filed an opposition to Malone's motion, but FINDS has not.  FINDS filed an answer to the complaint, and a counterclaim against the plaintiff to recover the debt it alleges it is owed by Gold & Appel.  FINDS is no longer represented by counsel in this proceeding, raising the prospect that its counterclaim may be dismissed.  If that dismissal occurs and is made with prejudice, that would moot Malone's attempt to avoid FINDS' lien as FINDS would no longer have a claim.

For summary judgment purposes, a court views the evidence in the light most favorable to the parties against whom summary judgment is sought.  Viewing the evidence that way, and after ascertaining those material facts as to which there is no genuine dispute, I conclude that Malone has shown that his motion should be granted in part.

Malone has shown that the transfers to Comverge, Iceberg, and Space were fraudulent as to creditors of Gold & Appel.  Malone has not shown, however, that the liens of Anderson and FINDS on the Transferred Assets were released or that the conveyances of liens to Anderson and FINDS on the Transferred Assets were themselves fraudulent conveyances.  Under 11 U.S.C. § 544, an unperfected lien is generally ineffective against a trustee in a bankruptcy case.  Malone, however, is a liquidator in a foreign proceeding, and this proceeding is filed in a case under 11 U.S.C. § 304 ancillary to that foreign proceeding.

Malone properly has not contended that he enjoys the powers of a
bankruptcy trustee under the Bankruptcy Code.[3]  Nor has he
pointed to a provision under British Virgin Islands law, or under
District of Columbia law, or other nonbankruptcy law, that is
comparable to 11 U.S.C. § 544, and that would allow the court to
treat an unperfected lien as ineffective in the British Virgin
Islands insolvency proceeding.  Accordingly, for purposes of
deciding this motion for partial summary judgment, I view Malone
as having failed to show that Anderson's and FINDS' asserted
liens must be treated as ineffective as against him.

I

THE FRAUDULENT CONVEYANCES TO COMVERGE, SPACE, AND ICEBERG

I will address first the avoidability of the transfers to
Comverge, Space, and Iceberg.  In the second part of this
decision I will address the avoidability of the liens on the
Transferred Assets.

However, the liens in favor of Anderson and FINDS play a
part in regard to the avoidability of the transfers to Comverge,

---

[3]  A case under § 304 of the Bankruptcy Code does not vest a
foreign representative with the powers of a trustee under § 544.
*See Metzeler v. Bouchard Transp. Co. (In re Metzler, Trustee in
Bankruptcy for Uni-Petrol Geselleschaft fuer Mineralolprudukte)*,
78 B.R. 674, 677 (Bankr. S.D.N.Y. 1987) ("a foreign
representative may assert, under § 304, only those avoiding
powers vested in him by the law applicable to the foreign
estate.").  Malone has not commenced a case regarding Gold &
Appel, under chapter 7 or 11 of the Bankruptcy Code, in which
§ 544 *would* apply, and no creditor has commenced such a case
either.

6

Space, and Iceberg: for the transfers to Comverge, Iceberg, and

Space to have been fraudulent transfers, it would be necessary

for Malone to show that the Transferred Assets were not fully

encumbered by perfected liens.  Under D.C. Code § 28-3101(12), a

"transfer" includes any "parting with . . . an asset or an

interest in an asset . . . ."  However, the term "asset" means

property of the debtor but does not include "[p]roperty to the

extent it is encumbered by a valid lien."  D.C. Code

§ 28-3101(2).  In turn, the term "valid lien" means "a lien that

is effective against the holder of a judicial lien subsequently

obtained by legal or equitable process or proceedings."  D.C.

Code § 28-3101(13).

Malone has shown that the liens that Anderson asserts that

he and FINDS had in Gold & Appel property were never perfected

under the D.C. Uniform Commercial Code such as to be effective

against the holder of a judicial lien.  Because the liens of

Anderson and FINDS were never perfected, the conveyances of

Transferred Assets to Comverge, Iceberg, and Space were

"transfers" of assets of Gold & Appel as that term is used in

fraudulent conveyance law.  In the course of discussing the

pertinent facts (part A, below), I conclude that those liens were

not released, but in the discussion of the applicable law, I

conclude (in part B(1), below) that they were not perfected, such

that the conveyances to Comverge, Space, and Iceberg are

"transfers" under the applicable statute.  In turn, the facts establish that a reasonable factfinder could only conclude that these transfers were intentionally fraudulent transfers (part B(2), below).

## A.  FACTS

Malone's statement of material facts not in genuine dispute is lengthy.  In large part, the facts he sets forth have not been challenged by Anderson, the only defendant who responded to Malone's motion for partial summary judgment.[4]  Those facts must be viewed in the light most favorable to the parties against whom summary judgment is sought, and my discussion of the facts views them in that way.

As pertinent to the claims against Comverge, Iceberg, and Space, the most critical fact is that there was no meaningful business justification for the transfers of assets from Gold & Appel (one entity controlled by Anderson) to Comverge, Iceberg, and Space (other entities controlled by Anderson), transfers made for no consideration when Gold & Appel was clearly on the ropes financially, and unable to pay its debts, by reason of huge debts owed to various unrelated non-insider creditors.

---

[4]  Even though Comverge, Iceberg, Space, and FINDS did not file an opposition to the motion for partial summary judgment, I will take into account those instances in which Anderson's affidavit has demonstrated that a material issue of fact exists as to them.

1.   FORMATION, AND ANDERSON'S CONTROL, OF GOLD & APPEL AND
     FINDS

Anderson formed Gold & Appel as a British Virgin Islands
corporation in 1992.  Anderson continuously controlled and
managed Gold & Appel through entities he exclusively controlled.
He hid his ownership of Gold & Appel through other entities,
pretending that he was acting on behalf of owners whose
identities he was obligated to keep confidential.[5]  One of the
entities through which he controlled Gold & Appel was Iceberg, to

---

[5]   This conclusion is based on specific uncontested material
facts stated by Malone, and by evidence filed by Malone.

whom he transferred all of the issued shares of Gold & Appel.[6]

On July 12, 1996, Anderson formed FINDS as a charitable corporation under Delaware law.  Anderson has effectively been in control of FINDS since its inception.[7]

2.   THE NORTEL OBLIGATIONS

In reliance upon a binding loan commitment made in the Spring of 2000 by Gold & Appel, a group of lenders led by Nortel Networks, Inc. (collectively, "Nortel") made loans in the

---

[6]   In 1993, Anderson, employing the alias "Mark Roth," caused the formation of Iceberg as a Panamanian entity.  Anderson directed that the stock in Iceberg be issued in bearer form and that these bearer shares be sent to him in the Netherlands.  On October 1, 1993, Anderson caused the Smaller World Trust to be formed under British Virgin Islands law.  He executed a *Declaration of Non Beneficial Ownership and Management Policy Agreement Between Walter Anderson and Smaller World Trust* (Anderson Ex. Y) that treats the Trust as owning the shares in Iceberg (which was to hold the issued shares of Gold & Appel) and treats Anderson as holding the option to purchase 990 shares of Gold & Appel for the benefit of the Trust.  Gold & Appel served as the sole trustee of the Trust until February 4, 2003, when it was replaced as the sole trustee by Iceberg.  The documents creating the Smaller World Trust identify Anderson as the settlor and the beneficiary as a "purpose trust" to be set up by Anderson to receive the assets of the Smaller World Trust at the end of its 13-year "term."  The documents do not identify the beneficiaries of the "purpose trust" but left their selection to a trustee to be selected by Anderson.  The "purpose trust" was never established by Anderson, and the trustee who was to select the beneficiaries of the "purpose trust" was never appointed by Anderson.  In 2004, Anderson created the Smaller World Foundation, a Panamanian entity designated by Anderson as a "change of venue" for the Smaller World Trust and intended to hold the assets of the Smaller World Trust under the same terms and conditions as set forth in the documents creating the Smaller World Trust.

[7]   *See* Malone's Statement of Material Facts at ¶¶ 13-17.

10

principal amount of $8.8 million to one of Gold & Appel's
portfolio companies named NetTel Communications, Inc. ("NetTel")
(the "First Nortel Obligation").  On or about April 20, 2000, and
in conjunction with the First Nortel Obligation, Gold & Appel
paid $1 million for NetTel stock.  In reliance upon a further
binding loan commitment from Gold & Appel dated July 17, 2000,
Nortel made additional loans to NetTel in the principal amount of
$18,905,000 (the "Second Nortel Obligation").  The First and
Second Nortel Obligations were in the nature of bridge loans that
were to be repaid no later than November 15, 2000, by Gold &
Appel.  Gold & Appel was to have provided a written commitment to
provide the funds by September 15, 2000, but did not provide
either the commitment or the funds.  Anderson asserted that,
prior to September 15, 2000, Gold & Appel advanced $13.8 million
to NetTel – $1.8 million in July 2000 and $12 million in August
2000.  The Second Nortel Obligation was in existence as of July
17, 2000 and was reduced to a judgment in the amount of
$25,690,713 on or about May 24, 2004, and has not been satisfied.
The First Nortel Obligation has not yet been reduced to judgment
and is a claim in the British Virgin Islands insolvency
proceeding.  The First Nortel Obligation was in existence no
later than April 20, 2000.  In the midst of incurring the Nortel
Obligations, Anderson caused Gold & Appel to make transfers of
funds ultimately used by One World Properties to purchase a

11

mansion in Madrid, Spain (the "Madrid Mansion"). This court held these transfers to be fraudulent conveyances. *See* Order dated June 2, 2008 (the "Madrid Mansion Order") (Dkt. No. 322).

3.   THE 2000 LOAN AGREEMENT AND COLLATERAL PLEDGE AGREEMENT

Anderson caused Gold & Appel to execute and deliver a certain *Mortgage Loan Purchase & Loan Agreement* that he dated July 1, 2000 (the "*2000 Loan Agreement*") pursuant to which Anderson lent $177,555 to Gold & Appel. The *2000 Loan Agreement* recited that Gold & Appel was having difficulty "realiz[ing] any liquidity" from its portfolio of assets.[8] The security provided for the $177,555 "loan" described in the *2000 Loan Agreement* is described in a *Collateral Pledge Agreement* that Anderson also dated July 1, 2000 and signed for all parties (the "*2000 Pledge Agreement*").[9] On November 14, 2000, Anderson and Gold & Appel

_____

[8]   Malone Ex. W (Chalmet Affidavit), at p. 44.

[9]   The collateral was:

   (i) shares in, and loans to, Aquarius Holdings Limited;

   (ii) shares in, and the $4 million loan to, MirCorp, even though that loan was not actually made until later;

   (iii) shares in CIS-Lunar Development Laboratories, Inc.; and

   (iv) shares in WWW.com.

Malone Ex. W (Chalmet Affidavit), ¶ 64 and Exhibit pages 46-50 thereto; Malone Decl., Exhibit "M," entry for 7/18/00.  Anderson signed the *2000 Loan Agreement* and the *2000 Pledge Agreement* for himself and for Gold & Appel.

entered into an *Amendment to "Mortgage Loan Purchase & Loan Agreement Dated July 1, 2000,"* signed by him for both, and memorializing an agreement for an additional loan of $163,000 that he transferred to Gold & Appel two days later on November 16, 2000.[10]  The *2000 Pledge Agreement* was amended by Anderson as of November 15, 2000, to add additional collateral.[11]

No financing, registration or similar statement was ever filed with respect to any of the collateral pledged under the *2000 Pledge Agreement* or the amendment thereto in either Washington, D.C. or the British Virgin Islands.  Anderson responds that he took physical possession of the share certificates that had been pledged as collateral.[12]  Anderson contends that he thereby perfected his security interest in those items of collateral.

---

[10]   Anderson Affidavit, ¶ 9 and Exs. H and I.

[11]   The additional collateral was:

- shares in X-Drive;
- shares in, and loans to, Galactech Corporation; and
- loans to, and warrants in, WWW.com.

Malone Ex. W (Chalmet Affidavit), ¶ 65 and Exhibit pages 51-52 thereto.  Anderson signed the amendment to the *2000 Pledge Agreement* for Gold & Appel and for himself.

[12]   Anderson Decl., ¶¶ 7 and 9.  The collateral with respect to WWW.com was warrants, not shares, but I will assume that Anderson means that he took possession of the evidence of warrants in WWW.com.

4.   GOLD & APPEL'S MARGIN CREDIT AT BROKERAGE FIRM

On July 13, 2000, Gold & Appel had, through Anderson, obtained almost $2 million in margin credit from Ferris, Baker, Watts, Inc. ("FBW").

5.   THE AUGUST 2000 LOAN FROM DONALD A. BURNS

On or about August 7, 2000 (after Gold & Appel had entered into the obligations to Nortel relating to NetTel) Donald A. Burns made a loan to Gold & Appel; Revision, LLC; Anderson; and Entrée International LLC ("Entrée") (a company owned and controlled by Anderson) in the original principal amount of $13,000,000 (subsequently increased to $14,310,400) (the "Burns Loan") and the debt evidenced by the Burns Loan was therefore in existence as of August 7, 2000.  The Burns Loan was secured by a stock pledge agreement by and among Anderson, Gold & Appel, Revision, FINDS, and Burns.  The Burns Loan was secured, in part, by 1,883,261 shares of Covista Communications, Inc. ("Covista"),[13] a publicly traded company, that were owned by

---

[13]   As of August 2000, Covista was known as Total Tel USA Communications, Inc. ("Total Tel").  On or about September 12, 2000, Total Tel changed its name to Covista.  For ease of reference, the name Covista is used throughout.

14

FINDS and Revision.[14]

6.   THE FINDS TRANSACTION INCIDENT TO THE BURNS LOAN

Anderson caused Gold & Appel and FINDS to enter into a "Loan Collateral Agreement" that states that it was "made on August 14, 2000" and that was signed by Anderson for all parties (the "*FINDS Collateral Agreement*").  In the *FINDS Collateral Agreement*, FINDS agreed to allow Gold & Appel to "use" 703,529 shares of Covista stock owned by FINDS as collateral for the Burns Loan until August 4, 2001.  The *FINDS Collateral Agreement* recites that in exchange for allowing Gold & Appel to "use" 703,529 Covista shares, Gold & Appel agrees to pay FINDS $150,000 and other compensation, and to be contingently liable to FINDS for damages

---

[14]   Malone states that 2,454,661 shares of Covista owned by FINDS, Revision, and Gold & Appel were pledged, but the evidence he cites for that, App. O ("App." refers to the Appendix in support of Malone's motion), at 3, recites that Revision pledged 1,179,732 shares and FINDS pledged 703,529 shares, a total of 1,883,261 shares.  As discussed later, FINDS stated in a filing of August 7, 2000, with the Securities and Exchange Commission ("SEC") that 2,454,661 Covista shares were pledged to Burns (which included the 703,529 shares owned by FINDS).  App. R.  No explanation for the variance between App. O and App. R has been furnished.

if the Covista shares were not ultimately returned to FINDS,[15] and to provide FINDS with collateral, which included shares in WorldxChange.[16]

Although Gold & Appel, through Anderson, agreed to the *FINDS Collateral Agreement*, no financing, registration or similar statement was ever filed relating to the *FINDS Collateral*

---

[15] The *FINDS Collateral Agreement* (Malone Ex. W, Exhibit pages 65-74) provided that if the Covista shares were sold by Burns or if the Covista shares were not returned to FINDS at the conclusion of the holding period ending August 4, 2001, then within 15 days after Burns sold the Covista shares or within 15 days after August 4, 2001, if the Covista shares were not returned to it, Gold & Appel was to pay FINDS:

- the $150,000; and

- "Value of the 703,529 shares plus 15%. Value to be determined by taking the closing price for the 10 trading days prior to the event."

FINDS was also to "receive the benefit of any dividend distributions, stock splits[.]" Finally, in the event of a default in making any payment when due, the obligation was to bear interest upon default at 18% per annum after demand for payment.

[16] The other collateral consisted of Gold & Appel's ownership of:

- certain 20th century paintings;
- shares in American Technology Labs, Inc.;
- shares in and a judgment against Digitel Telecommunications International, Inc.;
- a convertible note owed by Incomnet, Inc.;
- shares in and a convertible note owed by Rotary Rocket Corporation;
- a loan owed by Teleport UK Limited (Satellite Media Services) and shares to be issued in exchange for that debt; and
- shares in Western Telecom.

*Agreement* in either Washington, D.C. or the British Virgin

Islands.  Anderson contends that he perfected FINDS' lien on

shares of stock by taking possession of them on behalf of FINDS.

The *FINDS Collateral Agreement* was amended by a document

dated August 10, 2001, to provide FINDS with additional

collateral, including a chose in action concerning the exchange

of shares in WorldxChange for shares in World Access, Inc.,[17]

which has resulted in $2,097,057.91 in cash held in escrow.

In the agreement, Gold & Appel also agreed to pay FINDS an

additional $150,000.[18]

Anderson is the sole signatory of the amendment to the *FINDS*

*Collateral Agreement* which he signed twice, once as "President"

of FINDS and once for Gold & Appel.  Although Gold & Appel,

through Anderson, purportedly signed and agreed to this amendment

---

[17]  The other collateral consisted of Gold & Appel's:

- debt owed by CD Import, giving it a right to shares in,
  CD Import;
- loan to MirCorp;
- loan to Western Telecom, with option for warrants in
  Western Telecom, and distribution rights in a French
  bankruptcy case regarding Western Telecom;
- loan to American Technology Labs with right of
  conversion to shares.

[18]  The amendment to the *FINDS Collateral Agreement* is
Malone Ex. W, Exhibit pages 75-76.  Anderson asserts that the
consideration for FINDS' entering into this agreement, as the
agreement recites, was that Gold & Appel was permitted to use the
Covista shares for an additional period of one year as collateral
for the Burns Loan, and thereby to obtain Burns' forbearance from
enforcement of the previously granted security interest.

to the *FINDS Collateral Agreement*, no financing, registration or similar statement was ever filed relating to the amendment to the *FINDS Collateral Agreement* in either Washington, D.C. or the British Virgin Islands.[19]

7.    ANDERSON CAUSES GOLD & APPEL TO DEFAULT ON ITS
      OBLIGATIONS TO NORTEL, BURNS, AND FBW

Default on Nortel Obligations; Judgment in Civil Action.

Gold & Appel failed to provide any written commitment to Nortel by September 15, 2000, and further failed to make all of the required loans to NetTel by November 15, 2000, thereby defaulting under its agreements with Nortel.  After Gold & Appel defaulted on its obligations to NetTel and Nortel, Nortel initiated a civil action on April 12, 2002 against Gold & Appel in the United States District Court for the District of Columbia. *See* Complaint [D.E. 1], *Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, Case No. 1:02-cv-00706 (JDB) (D.D.C.) (the "Nortel Action").  On May 24, 2004, that court entered final judgment in favor of Nortel and against Gold & Appel on the

_____

[19]    Nor was the pledge in favor of FINDS disclosed in the SEC filing that disclosed the liens that FINDS granted to Burns. That statement recited that "[i]n consideration for FINDS' pledging its 703,529 [Covista shares], Gold & Appel will pay to FINDS a sum equal to $70,352.90 for the first six months such shares are pledged [and] . . . after such six-month period . . . the sum of $20,000 per month for each additional month Finds' shares are held as collateral under the Stock Pledge Agreement." Neither party has suggested why the SEC filing listed compensation to be paid FINDS by Gold & Appel that is different from the compensation listed in the *FINDS Collateral Agreement* and the amendment thereto.

Second Nortel Obligation in the amount of $25,690,713.59 (the "Nortel Judgment").  At the request of Nortel, further action on its claims with respect to the First Nortel Obligation was held in abeyance.  The Nortel Judgment remains unsatisfied.[20]

On or about February 11, 2002, the Burns Loan became due and payable, but neither Gold & Appel nor any of its co-debtors made the required payments.  The borrowers' failure to pay constituted an immediate default and, accordingly, on February 13, 2002, Burns served Gold & Appel (along with its co-debtors on the Burns Loan) with a notice of default.  Negotiations between Anderson and Burns with respect to the defaulted Burns Loan did not succeed and, as will be seen, FINDS issued its own notice of default on August 15, 2002.

On or about April 12, 2002, after Gold & Appel had earlier failed to pay its obligations to FBW, FBW filed a motion for summary judgment in lieu of complaint against Gold & Appel in the Supreme Court for the State of New York, Case No. 04-600340.  On or about December 10, 2003, FBW domesticated its New York judgment against Gold & Appel in the Circuit Court for Montgomery County, Maryland, in the amount of $1,912,695.20 plus interest (the "FBW Judgment").

---

[20]   Malone Decl., ¶ 29.

8.   THE JULY 28, 2002 LOAN AND PLEDGE AGREEMENTS

After Nortel had filed its civil action against Gold &

Appel, after Burns had declared the Burns Loan in default, and

after FBW had sued Gold & Appel in New York, Anderson caused Gold

& Appel to incur a third debt to him.   On July 28, 2002, Anderson

and Gold & Appel entered into a Loan Agreement (the "*2002 Loan

Agreement*") pursuant to which Anderson, among other things, lent

Gold & Appel $1,296,636 for a period of one year at an interest

rate of 7.5%.[21]

The *2002 Loan Agreement* was accompanied by a Loan Pledge

Agreement ("*2002 Pledge Agreement*"), by and between Anderson and

Gold & Appel, and also dated July 28, 2002.[22]   Under the *2002*

---

[21]   Malone Ex. W (Chalmet Affidavit), ¶ 71 and Exhibit pages
77-78 thereto.   Gold  Appel's banking records show incoming funds
on July 31, 2002 in the amount of $1,296,636.00.   Malone Decl.
and Exhibit "M" thereto, entries for July 31, 2002.   Those
incoming funds are designated "FX SettlemeSTG@1.5675" (i.e.,
"foreign exchange settlement" STG @ 1.5675) which indicates that
the funds originated as British pounds sterling ("STG").   See
Barclays Business Banking website printout, App. S (showing that
"STG" is an abbreviation for "pounds sterling") and attached
information from the Bank of England website (to which the
Barclays materials direct the reader) showing the exchange rate
on July 31, 2002 for pounds sterling to dollars was 1.5670.
Anderson explains that the funds originated from the sale of some
artwork that was owned by him, and sold at auction at Christie's
London location to raise funds for this loan.   Anderson Decl.
¶ 55.   He further explains that "the asset sold at auction was a
painting by Paul Delvaux which I had purchased around 1½ years
before from a private dealer," and attaches the sale confirmation
issued to him by Christie's. *Id*. ¶ 22.

[22]   Malone Ex. W (Chalmet Affidavit), ¶ 71 and Exhibit pages
79-83 thereto.

*Pledge Agreement*, Gold & Appel pledged to Anderson certain

collateral, including the AAT shares and shares in Panztel,

Ltd.[23]  Anderson is the sole signatory to the *2002 Pledge*

*Agreement*.  Anderson signed the *2002 Pledge Agreement* twice, once

for himself and once for Gold & Appel.  Although Gold & Appel,

through Anderson, agreed to the *2002 Pledge Agreement*, no

financing, registration or similar statement was ever filed

relating to the *2002 Pledge Agreement* in either Washington, D.C.

or the British Virgin Islands.

    9.    FINDS AND ANDERSON DECLARE GOLD & APPEL IN DEFAULT, AND
          BURNS COMMENCES A CIVIL ACTION AGAINST GOLD & APPEL TO
          RECOVER ON THE BURNS LOAN

    Anderson caused FINDS to send a letter to Gold & Appel dated

August 15, 2002--only 18 days after the date of the transfers

made to Anderson under the *2002 Loan Agreement*--declaring Gold &

Appel in default of the *FINDS Collateral Agreement* on account of

Gold & Appel's default on its obligations to Burns.[24]  The August

15, 2002 letter demands that Gold & Appel pay FINDS the aggregate

_____

    [23]  The collateral also included:

    •    shares in Constellation Services, Inc.;
    •    shares in LunaCorp;
    •    shares in Orbital Recovery Corporation; and
    •    Gold & Appel's interest in loans made to certain
         individuals named Rossi, Furman and Cooper.

*Id.*

    [24]  Malone Ex. W (Chalmet Affidavit) ¶ 72 and Exhibit page
84 thereto.

amount of $3,455,327[25] but states that "[b]ased upon information which FINDS has about Gold & Appel's current liquidity, it is unlikely that Gold & Appel will be able to pay this amount . . . ."[26]  The letter then states that FINDS will determine what action to take with respect to the collateral "being held" under the *2000 Pledge Agreement*.[27]  Anderson signed the August 15, 2002 letter as the "President" of FINDS.

On or about September 5, 2002, Burns brought an action against Gold & Appel and its co-debtors to collect the Burns Loan styled *Donald A. Burns v. Walter Anderson, et al.*, Case No. 02-1326-A in the United States District Court for the Eastern District of Virginia, Alexandria Division (the "Burns Action").

Anderson then sent a letter dated September 9, 2002, to Gold & Appel declaring it in default under the *2000* and *2002 Loan*

---

[25]  The August 15, 2002 letter stated:

Gold & Appel, per the LOAN COLLATERAL AGREEMENT is required to pay the following by August 30, 2002 (within 15 days).

| | |
|---|---|
| Use of collateral fee for 1st year | $150,000 |
| Use of collateral fee for 2nd year | $150,000 |
| Value of 703,529 shares (close 8/14/02@3.90) | $2,743,763 |
| 15% premium on share value | $411,564 |
| | |
| TOTAL DUE | $3,455,327 |

[26]  Malone Ex. W (Chalmet Affidavit) ¶ 72 and Exhibit page 84 thereto.

[27]  Malone Ex. W (Chalmet Affidavit) at Exhibit page 84.

*Agreements*.[28]  In his September 9, 2002 letter Anderson states

that "[i]t is clear that Gold & Appel Transfer S.A. does not have

the liquidity at this time to repay these loans."  In this same

letter, Anderson also states:

> Due to existing agreements which I have with Gold & Appel
> Transfer S.A.[,] Iceberg Transport S.A. and the ultimate
> beneficial owner of these organizations, I can not have
> the collateral for these loans to be transferred to me or
> any organization which I own.
>
> I am considering an arrangement in which the collateral
> can be reorganized under existing owner(s) with a
> possible extension of the loans.
>
> In the mean time these assets may not be encumbered or
> disposed of without written permission from me.
>
> I reserved [sic] all rights in relation to these
> agreements in the collateral associated with the loans.

As of September 9, 2002, Gold & Appel's bank balance was less

that $4,000.[29]

>     10.  THE ICEBERG LETTER OF DECEMBER 14, 2002 - A LETTER OF
>          INTENT CALLING FOR A TRANSFER OF THE COLLATERAL FOR THE
>          FINDS AND ANDERSON LOANS

After Nortel, Burns, and FBW had already sued Gold & Appel,

Anderson caused Iceberg to send a letter dated December 14, 2002,

to Anderson, FINDS and Gold & Appel, executed by Anderson for

Iceberg and those three entities as a letter of intent, and

concerning Gold & Appel's defaults on its indebtedness to

---

[28]  Malone Ex. W (Chalmet Affidavit) ¶ 73 and Exhibit page
85 thereto.

[29]  Malone Decl., ¶ 27 and Ex. M thereto, entry for 9/9/02.

Anderson and FINDS (the "*Iceberg Letter*").[30]  The *Iceberg Letter*

addresses the collateral held by Gold & Appel for Anderson and

FINDS, and recites that:

> Gold & Appel does not have sufficient cash or assets
> which can be easily liquidated at this time to pay back
> the financial obligations to Walt Anderson and FINDS. The
> collateral which FINDS and Walt Anderson are holding
> while not liquid may increase in value in time and become
> more liquid in the future.
>
> Walt Anderson and FINDS have the option, under their
> agreements with Gold & Appel to take over their
> collateral and attempt to operate the companies or
> liquidate the assets. Walt Anderson and FINDS would
> prefer to have the collateral assets remain under
> professional management and wait until they can become
> liquid over time.
>
> Walt Anderson and FINDS agree on the following:
>
> > The Walt Anderson and FINDS collateral assets will
> > most likely increase if the companies are allowed
> > to continue operations without disruption.
> >
> > The collateral consists of equity holdings and debt
> > that cannot be liquidated easily of [sic]
> > effectively at this time.
> >
> > Walt Anderson and FINDS do not want to own or
> > manage these assets and are only interested in
> > ultimately being repaid the funds due to them plus
> > appropriate interest.

The absurdity of these recitals, of course, is that Anderson,

through his ultimate ownership of Gold & Appel and of Comverge,

Space, and Iceberg, was the individual who was already managing

the assets, and who would continue to manage them after the

---

[30]  Malone Ex. W (Chalmet Affidavit), ¶ 74 and Exhibit pages
86-88 thereto.

contemplated transfers.  The *Iceberg Letter* then keeps up the

pretense, stating:

> Walt Anderson has existing agreements with Iceberg, and
> Transport S.A., the parent company of Gold & Appel and
> the ultimate beneficial owner of Iceberg Transport S.A.
> It may create a conflict of interest for Walt Anderson
> to exercise ownership control of or to become the
> beneficial owner of these collateral assets.

The *Iceberg Letter* then recites that it is in the best interests

of Anderson and FINDS that the various items of collateral to

which they were entitled as a result of Gold & Appel's defaults

continue to remain under "professional management" (professional

management that Anderson himself was performing).[31]  Anderson and

FINDS state that they will allow Iceberg and Gold & Appel "to

extend terms of payment in an agreement with the following basic

premises," to wit:

> To allow the continuing professional management of the
> collateral assets.
>
> Walt Anderson and FINDS agree that the collateral assets
> are to be transferred from Gold & Appel per a planned
> reorganization to newly formed fund vehicles (Space
> Incorporated S.A and Comvergent Ltd. [eventually
> organized instead as Comverge Ltd.) which will be 100%
> owned by Iceberg Transport S.A.
>
> Walt Anderson and FINDS agree to exchange their
> collateral rights in individual assets for a **collective
> interest** in which the **fund vehicles shares** are
> collateral.

---

[31]  The collateral the *Iceberg Letter* addresses consists of
the assets previously identified as collateral in the *2000 Loan
Agreement*, the *2000 Pledge Agreement*, the *FINDS Collateral
Agreement*, and the *2002 Pledge Agreement*.

> Walt Anderson and finds **will exchange their collateral
> interests and rights for a new loan agreement to be**
> guaranteed by Iceberg Transport and **secured by collateral
> interests in the new fund vehicles**.
>
> Walt Anderson and FINDS will be paid the full amount
> which was originally owed by Gold & Appel within a 3
> year period plus a reasonable interest rate. **All
> payments will be prorated based on the relative value of
> the indebtedness**[.]
>
> Gold & Appel will not have any continuing rights or
> interest in relation to the disposition of the collateral
> rights held by Walt Anderson and FINDS. Walt Anderson
> and FINDS will have **joint continuing right and interest
> in all the collateral which they have arranged to
> transfer to the new fund vehicles**.

[Emphasis added.] As anticipated that "an agreement" would be

forthcoming, the *Iceberg letter* was followed by a *Consolidated

Note* of March 31, 2003, and the *Reorganization Agreement* of April

5, 2003, carrying out (with minor changes) the intent of the

*Iceberg Letter*. *See infra*, points 13 and 14.

> 11. THE ICEBERG LETTER WAS NOT AN AGREEMENT BY ANDERSON AND
> FINDS TO RELEASE THEIR LIENS

Malone contends that the paragraph regarding exchanging

collateral rights amounted to an agreement by Anderson and FINDS

to release their liens upon the assets that had been pledged to

them as collateral in exchange for liens only on the equity

interests in the "fund vehicles." I reject that contention for

the following reasons.

First, the language is ambiguous because it could be read as

meaning that Anderson and FINDS were exchanging their separate

26

lien rights by combining their liens to be used for each other's benefit as between themselves ("a collective interest") resulting in prorated payments to them, with Anderson and FINDS additionally obtaining liens on the shares of the new fund vehicles.

Second, the concluding paragraph quoted above can be read as meaning that, in contrast to Gold & Appel, whose interest in the collateral it had pledged would cease upon the transfer of the collateral to the new fund vehicles, Anderson and FINDS' liens were to continue in that collateral upon the transfer of the collateral to the new fund vehicles.

12.  SUBSEQUENT EVENTS IN THE BURNS LITIGATION

On March 31, 2003, the court in the Burns Action granted partial summary judgment to Burns.[32]  Left for trial, as far as Burns's monetary claim against Gold & Appel was concerned, was the issue of the calculation of the deficiency Gold & Appel would owe based on the credit to be given for the Covista stock that had been pledged to Burns.  That trial ensued and was concluded on April 2, 2003.

13.  THE MARCH 31, 2003 CONSOLIDATED NOTE

In the midst of the Burns Action proceeding to a trial (with major issues resolved by a partial summary judgment ruling),

---

[32]  *Memorandum Opinion*, March 31, 2003 in the Burns Action, App. X.

27

Anderson caused Gold & Appel to enter into a consolidated note
for its obligations to Anderson and FINDS, with the collateral
for the loans transferred to Comverge, Space, and Iceberg. "As
of March 31st 2003," Anderson caused Gold & Appel, Comverge,
Space, Iceberg, FINDS and himself to enter into a "Consolidated
Note (Smaller World Funds)" (the "*Consolidated Note*").[33]

Comverge is a Bahamas international business company that
was formed by Anderson in March, 2003. All of the authorized
shares of Comverge, issued by Anderson as the corporation's sole
director on March 18, 2003 (in the midst of the Nortel Action and
the Burns Action), were initially issued to Anderson, who then
transferred them to Iceberg on March 25, 2003, for no
consideration.[34] Space is a British Virgin Islands international
business company formed by Anderson in August, 2002 (after Burns
had declared a default, a month before the Burns action
commenced, and after Nortel and FBW had commenced their actions
against Gold & Appel).[35] All of the authorized shares of Space
were initially issued to Anderson, who, in January 2003,
transferred them to Iceberg for "$1.00" in consideration paid on
behalf of Iceberg by Gold & Appel.[36]

---

[33]   Malone Decl., ¶ 32 and Ex. Z thereto.

[34]   Malone Decl., ¶ 33 and Ex. AA thereto.

[35]   Malone Decl., ¶ 35, Ex. BB thereto.

[36]   *Id.*

28

The "Borrower" under the *Consolidated Note* comprises Gold & Appel, Comverge, Space and Iceberg.[37]  Anderson and FINDS are, collectively, the "Lender."  As anticipated in the *Iceberg Letter*, the *Consolidated Note* amends and restates the supposed obligations arising under the *2000 Loan Agreement*, the *FINDS Collateral Agreement* and the *2002 Loan Agreement*, as all had been amended time to time.[38]  The *Consolidated Note* recited that Anderson and FINDS "held shares and debt of various companies as collateral against the debt owed by [Gold & Appel];" that upon Gold & Appel's default they:

> did not wish to take over control and management of assets and instead entered into agreements with Gold & Appel and Iceberg . . . to **reorganize the assets per a pre-existing plan into industry specific funds in which [Anderson and FINDS] can retain collateral rights** until paid [emphasis added];

and that the indebtedness to Anderson and FINDS "is hereby consolidated to form one single note and one single indebtedness."  Consistent with the *Iceberg Letter*, this indicates that under the *Consolidated Note*, Anderson and FINDS were to retain their security interests in the collateral. Section 6 of the *Consolidated Note* ("EVENTS OF DEFAULT AND

---

[37]  The *Consolidated Note* is signed six (6) times by Anderson, for himself, as "president" of Comverge, as "power of attorney-in-fact" for Gold & Appel, as "power of attorney-in-fact" for Iceberg, as "president" of Space and as "president" [sic] of FINDS.

[38]  Malone Decl., ¶ 32 and Ex. Z thereto.

ACCELERATION") stated, in part, that:

> Taking any action to sell transfer, borrow against or
> otherwise reduce the value of any of the "Collateral"
> which is held jointly by the Lenders shall be an even
> [sic] of default ("Event of Default") hereunder.

The term "Collateral" was not defined but presumably means the

existing collateral of the Lenders (Anderson and FINDS), the

"shares and debt of various companies" referred to in the opening

recitals.  Again, consistent with the *Iceberg Letter*, this

indicates that under the *Consolidated Note*, Anderson and FINDS

were to retain their security interests in the collateral.

Section 8 of the *Consolidated Note* recites:

> The parties that comprise the Lender have exchanged their
> collateral rights in equity and debt of various companies
> into **combined collateral right** to hold the 100% of the
> outstanding shares in the corporations comprising the
> Borrowers.  The borrowers agree not to transfer, borrow
> against or otherwise encumber these shares without
> express permission in writing from Lenders.

[Emphasis added.]  Malone contends that this amounted to a

release of the liens held by the Lenders (Anderson and FINDS) in

exchange for liens on the shares of stock of the Borrowers (Gold

& Appel, Comverge, Space and Iceberg).  However, that

interpretation is inconsistent with the earlier recitals that

indicate that, consistent with the *Iceberg Letter*, Anderson and

FINDS are *not* relinquishing their liens, and that instead they

are engaging in a "pooling of their collateral interests."  As to

the shares of various companies that had been serving as

collateral, this specific provision of the *Consolidated Note*

30

ought to be interpreted, consistent with the earlier recitals, as
meaning that:

- Anderson and FINDS, with the consent of the Borrowers,
  were pooling their collateral--each was giving up its
  individual rights in the collateral in exchange for a
  "combined collateral right" treating 100% of the
  various shares of collateral allocated to the Borrowers
  as now combined collateral to secure payment of both of
  their claims.

- The combined collateral right extended to all of
  the collateral that had been held by Anderson and
  FINDS, that was now to be held by Comverge, Space,
  and Iceberg as "new industry specific funds."  The
  phrase "100% of the outstanding shares in the
  corporations comprising the Borrowers" means that
  now that Anderson and FINDS share a combined
  collateral right, 100% of the collateral being
  placed in Comverge, Space, and Iceberg is held as
  combined collateral for payment of their debts.

The last sentence ("The borrowers agree not to transfer, borrow
against or otherwise encumber these shares without express
permission in writing from Lenders.") fits nicely with that
interpretation.  That interpretation also jibes with the
statement in the *Iceberg Letter* that Anderson and FINDS were to

31

have "joint continuing right and interest in all the collateral which they have arranged to transfer to the new fund vehicles."

The foregoing analysis works well as to shares of stock that Gold & Appel had pledged as collateral to Anderson and FINDS, but what about debt obligations that Gold & Appel had pledged to Anderson and FINDS as collateral? Despite the sloppy draftsmanship of the *Consolidated Note*, the *Iceberg Letter* demonstrates that the parties intended all of the existing collateral to continue to serve as collateral. The *Consolidated Note* can be interpreted as consistent with that by treating "outstanding shares in the corporations comprising the Borrowers" as meaning the shares of collateral respectively being allocated to the three Borrowers (in other words, the assets that were to "compris[e] the Borrowers" as new investment funds). Only that interpretation is consistent with the *Iceberg Letter* and with the *Consolidated Note*'s earlier recitals that provide for all of the collateral to continue to serve as collateral.[39] Moreover, as will be seen, on April 5, 2003, shortly after the March 31, 2003,

---

[39] On the other hand, this provision of the *Consolidated Note* would fall short in preserving all of the collateral as collateral if the term "shares" includes only shares of stock that were collateral and does not include those items of collateral that were "debt of various companies." In that event, this provision could be read as stating that new combined collateral does not include the "debt of various companies" held by Anderson and FINDS "as collateral" for their loans. I reject that interpretation because it is inconsistent with the *Iceberg Letter* and with the earlier provisions in the *Consolidated Note*.

32

date of the *Consolidated Note*, the parties to the *Consolidated Note* entered into their *Reorganization Agreement* that made clear that Anderson and FINDS were retaining their liens against all of the individual assets (shares of stock in and debts owed by various companies) that Gold & Appel had pledged as collateral.

Comverge, Space, and Iceberg paid no consideration to Gold & Appel for the transfers to them.  The *Consolidated Note* extended the due date of the obligations for three years to April 1, 2006, but in the transaction Gold & Appel gave up all of the collateral to entities controlled by Anderson, depriving Gold & Appel of assets that would otherwise be available for creditors in its ensuing insolvency proceedings.[40]  There was no reason why Gold & Appel--instead of Comverge, Space, and Iceberg--could not have retained the collateral and remained the sole obligor on the *Consolidated Note*.

14.   THE REORGANIZATION AGREEMENT OF APRIL 5, 2003

On or about April 5, 2003, five days after the date of the *Consolidated Note*, five days after the court in the Burns Action had granted partial summary judgment in favor of Burns, and three days after trial in the Burns Action was completed, Anderson

---

[40]  The *Consolidated Note* changed the interest rate to 12% per annum, with a default rate upon maturity of 16% per annum coupled with a late charge of 4.8% per annum (four cents each dollar per month) for an effective total rate of 20.8% upon maturity, versus 7.5% on the obligations to Anderson, and versus 18% on the obligation to FINDS.

33

caused Iceberg, Comverge, Space, Gold & Appel, and FINDS to enter

into the *Reorganization Agreement* (titled *Agreement in Relation*

*to Re-Organization of Private Funds*).[41]   Anderson had earlier

made reference to this reorganization scheme detailed in the

*Reorganization Agreement* in a letter dated September 9, 2002,[42]

and had further referred to it in the *Iceberg Letter* of December

2002.

    The *Reorganization Agreement* reflected an agreed transfer of

various assets that were serving as collateral in favor of

Anderson and FINDS to one of either Comverge, Space, or

Iceberg,[43] stating that each of those transferees "holds" such

collateral or is having the collateral "allocated to" it as of

December 14, 2002 (in the case of Space and Iceberg) or as of

---

[41]   Malone Ex. W (Chalmet Affidavit), ¶ 75 and Exhibit pages
89-96 thereto.  Anderson is the sole signatory of the
*Reorganization Agreement*, which he signed six (6) times, once
personally, once as President of FINDS, once for Gold & Appel,
once for Iceberg, once as President of Space and once as
President of Comverge.

[42]   Malone Ex. W (Chalmet Affidavit) at Exhibit page 85.

[43]   The Gold & Appel property transferred to Comverge, Space
and Iceberg comprises the assets (other than the TWCD mortgage
and certain "20th century paintings") pledged under the *2000 Loan
Agreement*, the *2000 Pledge Agreement*, the *FINDS Collateral
Agreement* and the *2002 Pledge Agreement*, all as subsequently
amended.  The *Reorganization Agreement* states that Gold & Appel's
ownership of the AAT Shares, Gold & Appel's interest in
WorldxChange and Gold & Appel's shares in Panztel, Limited are
being transferred to Comverge, and Anderson then directed AAT to
transfer the AAT shares held by Gold & Appel to Comverge and
Panztel to transfer Gold & Appel's Panztel shares to Comverge.
Malone Decl., ¶ 35 and Exhibit DD thereto.

March 19, 2003 (in the case of Comverge, whose own shares were not issued until the previous day).[44]  Paragraph 10 of the *Reorganization Agreement* provides:

> all parties to this agreement acknowledge and agree that [Anderson and FINDS] retain there [sic] respective interests and rights in the collateral even though they have elected not to take ownership or exercise control over the management of the interest [sic] at this time.

Moreover, paragraph 15 of the *Reorganization Agreement* provided that in the event of a default under the "CONSOLIDATED LOAN AGREEMENT for WALT ANDERSON and FOUNDATION for the INTERNATIONAL NON-GOVERNMENTAL DEVELOPMENT of SPACE," Anderson and FINDS could "transfer collateral from [Comverge, Iceberg or Space] respectively."  These provisions appear to be dispositive of whether Anderson and FINDS intended to release their liens via the *Consolidated Note*.  The *Consolidated Note* and the *Reorganization Agreement* are dated close in time, and the *Consolidated Note* recites that Anderson and FINDS have "entered

---

[44]  The *Reorganization Agreement* provided that collateral relating to telecommunications companies "will be transferred to Comverge;" collateral relating to companies having business activities relating to space or space technologies "will be transferred to Space;" and equity or debt interests in Aquarius Holdings Limited "will be transferred to Iceberg . . . ."  It then recited that per the *Iceberg Letter*, the equity and debt interests in companies had been transferred to Comverge, Space, and Iceberg on the books of Gold & Appel (and on the books of the transferees).  It treated Comverge as holding on March 19, 2003 (the day after the issuance of its stock to Anderson) interests in various telecommunication companies.  It treated Space and Iceberg as holding the collateral transferred to them as of December 14, 2002 (the date of the *Iceberg Letter*).

into agreements with Gold & Appel and Iceberg . . . to reorganize the assets per a pre-existing plan into industry specific funds in which [Anderson and FINDS] can retain collateral rights."  A reasonable finder of fact could conclude that the *Consolidated Note* intended the *Reorganization Agreement* to control regarding the retention of collateral rights, that the *Consolidated Note* and the *Reorganization Agreement* are part of the same transaction, and that Anderson and FINDS were to retain their security interests in the collateral being transferred to Comverge, Space, and Iceberg.[45]  Malone responds that the *Reorganization Agreement* expressly provided that it was not intended to modify the *Consolidated Note*.  He relies upon paragraph 11 of the *Reorganization Agreement*, which provided:

> Any payments made by COM, ICE or SI against the loans to WA and FINDS will be proportionate to the amount due to each party.  No funds may be paid to one party without the other party receiving their respective share. Additional conditions relating to the allocation of payments and interest in the collateral may be contained in the "CONSOLIDATED LOAN AGREEMENT for WALT ANDERSON and FOUNDATION for the NON-GOVERNMENTAL DEVELOPMENT OF SPACE" **and nothing in this agreement is intended to override, change or modify that agreement.**

---

[45]  The record contains no explanation for why the *Reorganization Agreement* is dated April 5, 2003, whereas the *Consolidated Note* (which refers to Anderson and FINDS having "entered into agreements with Gold & Appel and Iceberg . . . to reorganize the assets") is dated as of March 31, 2003.  It is further noted that the *Reorganization Agreement* and the *Consolidated Note* conflict as to the maturity date of the obligation: that date is April 1, 2006 under the *Consolidated Note* and is December 31, 2006 under the *Reorganization Agreement*.

36

[Emphasis added.]  No document titled Consolidated Loan Agreement
for Walt Anderson and Foundation for the Non-Governmental
Development of Space has been submitted.  (The *Consolidated Note*
was titled "CONSOLIDATED NOTE (Smaller World Funds.")  Even
assuming that the *Consolidated Note* and the referenced
Consolidated Loan Agreement for Walt Anderson and Foundation for
the Non-Governmental Development of Space are one and the same,
Malone's argument is unpersuasive.  The *Consolidated Note* is at
least ambiguous regarding the retention of security interests in
all of the collateral, and the *Reorganization Agreement* clarifies
the intent of the parties under the *Consolidated note*: it does
not override, change, or modify the *Consolidated Note*.  Moreover,
the quoted passage relates to "the allocation of payments and
interest" between Anderson and FINDS and the anti-modification
clause can be read as relating to only that issue of "the
allocation of payments and interest."

The *Reorganization Agreement* did not alter the ultimate
"ownership" of any asset, according to Anderson, but simply
transferred the Gold & Appel assets from one "investment company"
owned and managed solely by Anderson--Gold & Appel--to others
also owned and managed solely by Anderson: Comverge, Space, and
Iceberg.[46]

---

[46]  Anderson Deposition, July 1, 2004, p. 71, lines 14-19;
p. 84, lines 8-18. App. Y.

Comverge had no capitalization other than the equity
interests it allegedly received from Anderson and FINDS under the
*Reorganization Agreement*.[47]   The purpose of the "reorganization,"
according to Anderson, was to allow FINDS and Anderson "to
maintain control of the collateral."[48]   The "reorganization,"
according to Anderson, "just changed my ability to more
effectively manage the fund . . . ."[49]   The *Reorganization
Agreement* transferred to Comverge, Space, and Iceberg all of the
Gold & Appel assets that had been identified as collateral in the
security agreements, discussed previously, in favor of Anderson
and FINDS.   Except for paintings conveyed to Space, those
transferred items of collateral are the Transferred Assets that

---

[47]   Anderson Deposition, July 1, 2004, p. 124, lines 2-4.
App. Z.

[48]   Anderson Deposition, July 1, 2004, p. 220, lines 15-18.
App. AA.

[49]   Anderson Deposition, July 1, 2004, p. 225, lines 6- 9.
App. BB.

Malone seeks to recover by the instant motion.[50]

15.   THE ENSUING JUDGMENT IN THE BURNS ACTION

On or about August 1, 2003, the court in the Burns Action entered judgment in favor of Burns and against Gold & Appel and its co-debtors, jointly and severally, in the amount of $11,633,874.87 (the "Burns Judgment") and on August 7, 2003, the court in the Burns Action released its opinion.[51]   The Burns Judgment was subsequently affirmed by the United States Court of Appeals for the Fourth Circuit and remains unsatisfied.[52]

---

[50]   The *Reorganization Agreement* also conveyed certain additional interests in entities that had not been identified as collateral in the security agreements in favor of Anderson and FINDS.   Malone has not included those as part of the Transferred Assets.   For example, *Reorganization Agreement* ¶¶ 5(b), 5(d)(v), and 5(d)(vii) listed as assets being conveyed to Comverge, Space, or Iceberg and as "collateral held by WA [*i.e.*, Anderson] and FINDS" Gold & Appel's interests in:

- Space Launch Corporation;
- XCOR Aerospace, Inc.; and
- Requisite.

The security agreements, discussed previously, in favor of Anderson and FINDS do not identify those interests as collateral, and Malone limited the Transferred Assets to those assets that were identified as collateral in those agreements.   Those additional interests are treated as not addressed by Malone's motion unless the interests are fruits of any of the Transferred Assets (for example, by way of a spinoff).

[51]   App. O.

[52]   Statement of Material Facts (Mansion), ¶ 5; Madrid Mansion Order at ¶ A; Malone Decl., ¶ 29.

16.   THE BRITISH VIRGIN ISLANDS INSOLVENCY PROCEEDING AND
DEVELOPMENTS WITH RESPECT TO GOLD & APPEL'S INTERESTS
IN ATT, WORLDXCHANGE, AND PANZTEL

Anderson managed and controlled Gold & Appel until Nortel

placed Gold & Appel in an involuntary insolvency proceeding in

the British Virgin Islands High Court of Justice on January 12,

2005, thereby initiating an action styled *In the Matter of the*

*Insolvency Act 2003 and In the Matter of Gold & Appel Transfer*

*S.A.*, Claim No. BVIHCV 2004/0130.[53]  At the time that it was

placed in liquidation, the debts owed by Gold & Appel to

creditors unconnected with Anderson or with any entities he

created or controlled exceeded $44 million.[54]  The Official

Liquidator initiated this adversary proceeding on May 16, 2005.

AAT Shares Proceeds.  In the Spring of 2007, AAT contacted

the Official Liquidator and expressed an interest in repurchasing

the AAT Shares.  On April 27, 2007, this Court granted approval

for a sale of the AAT shares.[55]  The proceeds of such

sale--$526,000--are being held in escrow pending receipt by the

escrow agent of an order of this court determining whether the

Official Liquidator or Comverge is the rightful owner of the AAT

Shares and hence of the proceeds of their sale.

---

[53]  *See* Statement of Material Facts (Mansion) at ¶¶ 1, 2;
Madrid Mansion Order at ¶ A. 113.

[54]  Malone Decl., ¶ 3.

[55]  *See* Dkt. No. 126 in Case No. 05-00775.

40

Funds Deriving From WorldxChange.  Gold & Appel's interest
in WorldxChange originated in an investment Anderson caused Gold
& Appel to make prior to any of the transactions that are the
subject of this motion.  In February 2000, WorldxChange agreed to
merge with World Access, Inc. ("World Access"), an entity in
which MCI WorldCom, Inc. ("MCI WorldCom") was a major
shareholder.  After World Access failed and filed a voluntary
bankruptcy case, former investors in WorldxChange, including Gold
& Appel, asserted fraud claims against, *inter alia*, MCI WorldCom
and various of its officers in state court in California.  Gold &
Appel and other investors in WorldxChange reached a settlement of
their claims in the California litigation, under which they were
to receive payments from the defendants.  After MCI WorldCom
filed its bankruptcy case, former investors in WorldxChange,
including Gold & Appel, also filed proofs of claim in the MCI
WorldCom bankruptcy case.  Gold & Appel and these other investors
in WorldxChange were also able to achieve a settlement of their
proofs of claim against MCI WorldCom in its bankruptcy case and
received shares of stock in Verizon Communications, Inc., in
consideration of such claims.

Because of Anderson's transfer of Gold & Appel's interest in
WorldxChange to Comverge, the Official Liquidator was not in a
position to settle Gold & Appel's claims without the
participation of Comverge.  The Settlement Agreement with respect

41

to the claims of Gold & Appel and the other investors in WorldxChange in the MCI WorldCom bankruptcy case was therefore also signed by Jean-Claude Chalmet as President of Comverge, and contained a statement that Comverge represents that on April 5, 2003, Gold & Appel assigned to Comverge its interests in the Proofs of Claim against the Debtors.  Gold & Appel disputes that it assigned its interests in the Proofs of Claim against the Debtors to Comverge or anyone else, and disputes Comverge's claims to the proceeds of this Settlement on numerous other grounds.

The shares of Verizon Communications, Inc. allocable to Gold & Appel in the settlement with MCI WorldCom on account of its allowed claim were subsequently liquidated and, together with the proceeds allocable to Gold & Appel from the settlement of the state court litigation relating to World Access, these sums-- aggregating $2,097,057.91 as of July 31, 2012--are currently being held in escrow pending an order of this Court determining that either the Official Liquidator or Comverge is the rightful owner of such funds.

Panztel Shares.  By stipulation and order entered on or about December 9, 2005, this court has approved an agreement between the Official Liquidator and Panztel that provides, *inter alia*, acknowledging that there is a dispute as to the ownership of Gold & Appel's stock interest in Panztel and further providing

that Panztel will recognize the judgment of this court as to the
ownership of such stock interest upon recognition of such
judgment by the New Zealand High Court.

### B. LAW

On those material facts as to which there is no genuine
dispute, Malone has established that the transfers to Comverge,
Space, and Iceberg were fraudulent conveyances.

Anderson ran Gold & Appel from offices in the District of
Columbia and has not disputed that it is appropriate to apply
District of Columbia fraudulent conveyance law.  Under the
District of Columbia's enactment of the Uniform Fraudulent
Transfer Act ("UFTA"), a transfer made by a debtor is fraudulent
as to present and future creditors if the debtor made the
transfer with the actual intent to hinder, delay or defraud any
creditor.  D.C. Code § 28-3104(a)(1) (2001).[56]

---

[56] As to remedies, District of Columbia law further
provides that in an action to avoid a fraudulent transfer a
creditor may obtain: "(1) [a]voidance of the transfer . . . to
the extent necessary to satisfy the creditor's claim; (2) [a]n
attachment or other provisional remedy against the asset
transferred or other property of the transferee . . .; (3)
[s]ubject to applicable principles of equity and in accordance
with applicable rules of civil procedure: (A) [a]n injunction
against further disposition by the debtor or transferor, or both,
of the asset transferred or other property; (B) [a]ppointment of
a receiver to take charge of the asset transferred or of other
property of the transferee; or (C) [a]ny other relief the
circumstances require." D.C. Code § 28-3107(a).

1.   THE CONVEYANCES TO COMVERGE, SPACE, AND FINDS WERE
     TRANSFERS UNDER THE UFTA

As previously explained, the conveyances at issue here were
not transfers under D.C. Code § 28-3101(12) if the assets
conveyed were fully encumbered by valid liens, meaning "a lien
that is effective against the holder of a judicial lien
subsequently obtained by legal or equitable process or
proceedings." D.C. Code § 28-3101(13). The Anderson and FINDS
liens were ineffective against a subsequent judgment lienor for
the following reasons, and thus the conveyances to Comverge,
Space, and FINDS were transfers under UFTA.

It is undisputed that neither Anderson nor FINDS filed a
financing statement with respect to the security interests at
issue. Anderson Resp. ¶¶ 7, 9, 12, 20. Thus, they did not
perfect their security interests in the Transferred Assets by
filing. Instead, Anderson claims that he perfected the security
interests by possession or control. *See* Anderson Resp. ¶¶ 4, 5,
7, 9, 12, 18, 20; Anderson Decl. ¶¶ 7, 9, 20, 23, 24, 25, 27-29.

More specifically, with respect to the AAT shares, Anderson
asserts that he "personally held the original share certificates
of Asia Access Telecom" and that he "informed the management of
Asia Access Telecom that I personally had a security interest in
these shares." Anderson Decl. ¶ 27. Anderson notes that he
"personally served on the Board of Directors of Asia Access
Telecom" to further secure his interest in the AAT shares.

Anderson Decl. ¶ 28.

Anderson alleges that he has "maintained control" of
the Panztel shares.  Anderson Decl. ¶ 20.  In particular,
Anderson states that he took the following actions:

> 24. The secured shares were purchased by Gold & Appel per
> a PANZTEL LIMITED SHARE OFFER (Exhibit P) relating to
> 248,139 shared of Panztel Ltd.  I personally retained
> this share purchase agreement and other documents related
> the [sic] Gold & Appel investment in Panztel.  Upon
> execution of the July 2002 LOAN AGREEMENT I informed
> Jonathan Hudson, the Managing Director of Panztel Ltd. of
> my collateral interest in the Gold & Appel shares.  To
> further secure my interest in relation to this Panztel
> collateral, I personally held all records generated by
> Panztel and sent to Gold & Appel by Panztel. Exhibit Q
> documents the Panztel Shares and the transfer of shares
> from Gold & Appel to Comverge as part of my control over
> my collateral interest.
>
> 25. To further secure the Panztel shares and protect my
> collateral interests in the Panxtel [sic] shares in
> relation to the July 2002 loan, I personally served on
> Panztel's Board of Directors as noted on page 2, in
> section listing "Director's Shareholding" of the PANZTEL
> LIMITED- ANNUAL REPORT AND CONSOLIDATED  FINANCILA [sic]
> STATEMENT dated 31 march, 2004 (Exhibit R).

Anderson Decl. ¶¶ 24, 25.[57]  Anderson explains: "Panztel under
New Zealand Law did not issue any share certificates so I took
possession of all the rocords [sic] related to the share purchase
and holding."  *Id*. ¶ 29.

---

[57]  Anderson's Exhibits Q and R are Panztel documents
reflecting Comverge's ownership of Panztel shares but they do not
reflect Anderson's lien on the shares.

*a. Certificated Securities*

Under Article 9 of the Uniform Commercial Code (U.C.C.), which the District of Columbia has adopted, "[a] secured party may perfect a security interest in tangible certificated securities by taking delivery of the certificated securities under § 8-301." U.C.C. § 9-313(a); D.C. Code § 28:9-313(a). In turn, U.C.C. § 8-301(a) provides in relevant part that delivery of a certificated security occurs when "the purchaser acquires possession of the security certificate[.]". U.C.C. § 8-301(a); D.C. Code § 28:8-301(a).

Possession is permitted as a means of perfection because it can provide notice of the creditor's interest to third parties. *See FDIC v. Kipperman (In re Commercial Money Ctr., Inc.)*, 392 B.R. 814, 830 (B.A.P. 9th Cir. 2008) ("The debtor's lack of possession and the creditor's actual possession of collateral serve to notify third-party creditors that the debtor 'no longer has unfettered use' of the collateral.") (quoting *Heinicke Instruments Co. v. Republic Corp.*, 543 F.2d 700, 702 (9th Cir. 1976)). "Thus, in order to effect perfection, possession must be 'unequivocal, absolute and notorious, so that third parties may be advised.'" *Hutchison v. C.I.T. Corp.*, 726 F.2d 300, 302 (6th Cir. 1984) (quoting *Transp. Equip. Co. v. Guar. State Bank,* 518 F.2d 377, 381 (10th Cir. 1975)).

46

Possession by a secured party who is closely associated with the debtor fails to give unequivocal notice to third parties and therefore does not perfect the security interest. *McDonald v. Nat'l Bank of Stigler (In re Hill)*, 7 B.R. 433, 436 (Bankr. W.D. Okla. 1980) (finding that the bank did not have a perfected security interest in a motorboat because it was in the possession of the debtor's father who was also a co-debtor). As explained in Official Comment 3 to U.C.C. § 9-313:

> The debtor cannot qualify as an agent for the secured party for purposes of the secured party's taking possession. And, under appropriate circumstances, a court may determine that a person in possession is so closely connected to or controlled by the debtor that the debtor has retained effective possession, even though the person may have agreed to take possession on behalf of the secured party. If so, the person's taking possession would not constitute the secured party's taking possession and would not be sufficient for perfection.

U.C.C. § 9-313, cmt. 3; *see also* 4 JAMES J. WHITE, ROBERT S. SUMMERS, & ROBERT A. HILLMAN, UNIFORM COMMERCIAL CODE § 31-8 (6th ed.) ("It is plain that certain persons should not be recognized as a proper agent of the creditor. Obviously this is true of the debtor and the debtor's agent as is suggested in the quote from comment 3.").

Anderson's taking possession of the certificated shares, such as the AAT shares, is not sufficient possession to perfect his security interest because he was so closely connected to the debtor, Gold & Appel, that his possession failed to give notice

47

to third parties of his interest.   Anderson was both the secured creditor and the person controlling the debtor.   Therefore, Gold & Appel "retained effective possession" of the securities and Anderson does not have a perfected security interest under the U.C.C. in the certificated securities that were part of the Transferred Assets.

*b. Uncertificated Securities*

Anderson also argues that he has a security interest in uncertificated securities.   A security interest in uncertificated securities, such as the Panztel shares, may be perfected by "control."   U.C.C. §§ 9-106, 9-314; D.C. Code §§ 28:9-106, 28:9-314.   Under the U.C.C.:

> (c) A purchaser has "control" of an uncertificated security if:
>> (1) the uncertificated security is delivered to the purchaser; or
>> (2) the issuer has agreed that it will comply with instructions originated by the purchaser without further consent by the registered owner.

U.C.C. § 8-106(c).[58]

This provision indicates that there are two possible ways that a purchaser may have control of an uncertificated security and thereby perfect his security interest.   The first way is if

---

[58]   A "purchaser" is a "person that takes by purchase," *see* U.C.C. § 1-201(30), and a "purchase" means "taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction creating an interest in property."   U.C.C. § 1-201(29).   Accordingly, Anderson is a purchaser within the meaning of this provision.

48

the purchaser accepts delivery of the uncertificated security.

U.C.C. § 8-106(c)(1). An uncertificated security is delivered to

a purchaser when:

> (1) The issuer registers the purchaser as the registered
> owner, upon original issue or registration of transfer;
> or
> (2) Another person, other than a securities intermediary,
> either becomes the registered owner of the uncertificated
> security on behalf of the purchaser or, having previously
> become the registered owner, acknowledges that it holds
> for the purchaser.

U.C.C. § 8-301(b).  Gold & Appel did not "deliver" the

uncertificated securities to Anderson within the meaning of

U.C.C. § 8-301(b).  First, there are no facts showing that the

issuer of the Panztel stock registered Anderson as the owner.

Second, there no facts suggesting that another person became the

registered owner of the uncertificated security on behalf of

Anderson or acknowledged that it held the security for Anderson.

Accordingly, Anderson does not have a perfected security interest

in the Panztel stock via delivery under § 8-106(c)(1).

A purchaser can also have control over the uncertificated

securities if the issuer (here, Panztel) has agreed that it will

comply with instructions originated by the secured party (here,

Anderson) without further consent of the owner (here, Gold &

Appel).  U.C.C. § 8-106(c)(2); *see also In re Pfautz*, 264 B.R.

551, 552 (Bankr. W.D. Mo. 2001) (applying Missouri law).

Anderson argues that the "transfer of [the Panztel] shares from

Gold & Appel to Comverge" is evidence of his control of the

49

Panztel shares.  Anderson Decl. ¶ 6.  But that share transfer
merely shows that the owner, Gold & Appel, transferred shares to
Comverge.  *See* Anderson Resp., Ex. Q.  There is nothing in the
record that shows that the issuer, Panztel, agreed to comply with
Anderson's instructions without further consent by the registered
owner of the stock, Gold & Appel.  Therefore, Anderson does not
have a perfected security interest in the Panztel shares via
§ 8-106(c)(2).

Having failed to obtain control under either prong of
§ 8-106(c), Anderson does not have a perfected security interest
in the Panztel shares.

*c. General Intangibles and Commercial Tort Claims*

To the extent Anderson and FINDS claim security interests in
general intangibles and commercial tort claims (such as the chose
in action concerning the WorldxChange shares), these interests
have not been perfected.  The only way to perfect a security
interest in general intangibles and commercial tort claims is by
filing.  U.C.C. § 9-310; D.C. Code § 28:9-310.  Anderson admits
that no filing was made.

2.   THE TRANSFERS WERE INTENDED TO HINDER OR DELAY
     CREDITORS

Under the District of Columbia's enactment of UFTA, a
transfer made by a debtor is fraudulent as to present and future
creditors if the debtor made the transfer with the actual intent
to hinder, delay or defraud any creditor.  D.C. Code

50

§ 28-3104(a)(1) (2001).  In determining whether a debtor actually intended to hinder, delay or defraud its creditors:

> consideration may be given, among other factors, to whether:
> (1) The transfer . . . was to an insider;
> (2) The debtor retained possession or control of the property transferred after the transfer;
> (3) The transfer . . . was disclosed or concealed;
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; . . .
> (6) The debtor absconded;
> (7) The debtor removed or concealed assets;
> (8) The value of the consideration  received by the debtor was reasonably equivalent to the value of the asset transferred . . . ;
> (9) The debtor was insolvent or became insolvent shortly after the transfer was made . . .;
> (10) The transfer occurred shortly before or shortly after a substantial debt was incurred . . .; and
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of debtor.

D.C. Code § 28-3104(b) (2001).  While it is often difficult for a claimant seeking to avoid a transfer as a fraudulent conveyance to present direct evidence to establish a debtor's actual intent to defraud creditors, *Kelly v. Armstrong*, 141 F.3d 799, 802 (8th Cir. 1998), summary judgment is appropriate "where all the facts 'point[] to a finding of intent with no inference of a pure motive possible.'"  *Consumers United Ins. Co. v. Smith*, 644 A.2d 1328, 1358 (D.C. 1994) (quoting *Jones v. Cent. Nat'l Bank of St. Johns*, 547 N.E.2d 887, 891 (Ind. Ct. App. 1989)).  Accordingly, the law recognizes certain "badges of fraud," including the factors enumerated in § 28-3104(b), as "common indicia . . .

51

which have frequently bespoken fraudulent intent in the past."
*Kelly v. Armstrong*, 141 F.3d at 802.   Once a claimant
"establishes a confluence of several badges of fraud, the
[claimant] is entitled to a presumption of fraudulent intent" and
"[i]n such cases 'the burden shifts to the transferee to prove
some legitimate supervening purpose for the transfers at issue.'"
*Id.* (quoting *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34
F.3d 800, 806 (9th Cir. 1994)); *see also Schilling v. Heavrin (In
re Triple S Rests., Inc.)*, 422 F.3d 405, 414-416 (6th Cir. 2005)
("Badges of fraud are circumstances so frequently attending
fraudulent transfers that an inference of fraud arises from
them." (internal quotation marks and citation omitted)).   "The
presence of a single badge of fraud may spur mere suspicion . . .
and the confluence of several can constitute conclusive evidence
of an actual intent to defraud, absent 'significantly clear'
evidence of a legitimate supervening purpose." *Max Sugarman
Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254-55
(1st Cir. 1991).   Once a record contains only evidence
establishing badges of fraud supporting an inference that the
transfer was made with an actual intent to defraud a creditor,
the transfer must be set aside as a fraudulent conveyance unless
sufficient evidence is presented to explain or justify the
circumstances constituting badges of fraud.   *Leonardo v.
Leonardo*, 251 F.2d 22, 26 (D.C. Cir. 1958).

The burden of proof applicable to Malone in seeking to avoid the transfers to Comverge, Space, and Iceberg is to show a fraudulent intent by clear and convincing evidence. *Consumers United*, 644 A.2d at 1358. That burden has been carried here. A reasonable finder of fact could only conclude that clear and convincing evidence existed that (1) the transfers display sufficient "badges of fraud" showing that the transfers were made with the actual intent to hinder, delay and defraud the creditors of Gold & Appel in the absence of a legitimate purpose for the transfers, and (2) that no such legitimate purpose existed--just as was the case with respect to the transfers in connection with the Madrid Mansion that was the subject of an earlier ruling of this court. *See* Dkt. No. 322.

The transfers to Comverge, Space, and Iceberg in March of 2003:

- were to insiders (corporations controlled and ultimately owned by Anderson, two of which, Comverge and Space, were formed in the midst of the civil actions brought by Nortel, Burns, and FBW);[59]

---

[59] Under D.C. Code § 28-3104(b)(1) a transfer to an insider is a factor to be considered. Comverge, Space, and Iceberg were insiders as affiliates of Gold & Appel. D.C. Code § 28-3101(1)(B) and § 28-3101(7)(E).

- were made in exchange for no consideration received from Comverge, Space, and Iceberg;[60]

- were made after Anderson had often acknowledged that Gold & Appel lacked liquidity of assets with which to pay debts, and when it had failed to pay Burns and FBW the debts owed them when those debts had come due, a situation that was, at least, akin to being insolvent under D.C. Code § 28-3102(b) (that is, generally not paying its debts as they came due);[61] and

- were made in the midst of civil actions to collect debts that Gold & Appel had been unable to pay, civil

---

[60] Under D.C. Code § 28-3104(b)(8), the lack of consideration is a factor to be considered. Although the *Reorganization Agreement* gave Gold & Appel further time to repay the debts owed Anderson and FINDS, that was the desire of Anderson and FINDS, who wanted the collateral to have time to increase in value and liquidity, and who, via the transfers, placed the assets beyond the reach of other creditors. Anderson and FINDS could have agreed to those new terms with Gold & Appel without the necessity of transferring the assets to Comverge, Space, and Iceberg.

[61] Under D.C. Code § 28-3104(b)(9), insolvency is a relevant factor. Anderson presented no evidence that as of 2003, Gold & Appel was paying its other debts as they came due. The burden, however, is on Malone to show insolvency, and he may not have met the statutory test if he has focused on only the few debts for which judgments were entered, and not debts in general. Nevertheless, Gold & Appel's inability to pay its debts and its failure to pay significant debts after they came due is evidence that bears on fraudulent intent in Gold & Appel's making the transfers to Comverge, Space, and Iceberg. The factors listed in § 28-3104(b) are not a straitjacket barring consideration of other factors that bear on motive.

actions in which substantial judgments were eventually

entered against Gold & Appel.[62]

By August of 2000, Gold & Appel had incurred debts to Nortel and

to Burns aggregating more than $40 million; in September of 2002

the Burns Action had commenced; in April of 2002 the Nortel

Action had commenced; and by April of 2002 Gold & Appel was being

sued for a debt owed FBW for which a judgment in excess of $2.9

million was entered.  The *Reorganization Agreement* itself noted

Anderson's intention that time be gained in which the collateral

could become liquid and be used to pay the debts owed to Anderson

and FINDS, and the *Iceberg Letter* had noted that the collateral

"while not liquid may increase in value in time and become more

liquid in the future."  Anderson concealed the transfers from

Gold & Appel's legitimate creditors by not filing financing

statements revealing his and FINDS' liens against the assets now

held by Comverge, Space, and Iceberg.[63]  Additionally, once the

transfers came to light, Anderson kept up the pretense that he

was not the de facto owner of Comverge, Space, and Iceberg.  By

attempting to surreptitiously transfer assets to offshore

entities beyond the reach of Gold & Appel's legitimate creditors,

---

[62]  Under D.C. Code § 28-3104(b)(4), a debtor's having been
sued is a relevant factor.

[63]  Under D.C. Code § 28-3104(b)(3), concealment is a
relevant factor.

Anderson effectively sought to abscond with Gold & Appel's assets.[64]

There are sufficient badges of fraud to mandate a finding of an intent to hinder and delay creditors unless Comverge, Space, and Iceberg showed a legitimate purpose for the transfers to them. The facts fail to show any such legitimate purpose. While Anderson's stated purpose for the transfer of assets to Comverge, Space, and Iceberg was to improve their "management," these assets remained under "management" by Anderson at all times,[65] and a reasonable finder of fact could only conclude that the reason Anderson replaced one investment management company--Gold & Appel--that he created, owned and controlled with others that he created, owned and controlled was that the new "management companies" did not owe the substantial debts burdening Gold & Appel, and that Anderson intended thereby to gain time so that, as recited in the *Iceberg Letter*, the assets "may increase in value in time," a goal that would be frustrated if Gold & Appel's

---

[64] Under D.C. Code § 28-3104(b)(6), a debtor's absconding is a relevant factor. Whether that means absconding with assets or, instead, means that the debtor itself fled from creditors does not matter. Even if it has the latter meaning, absconding in the former sense is similarly indicative of a fraudulent intent. The factors listed in § 28-3104(b) are not exclusive.

[65] Under D.C. Code § 28-3104(b)(2), a debtor's continued retention of possession or control of the property transferred is a relevant factor. Anderson, who was the only person acting on behalf of Gold & Appel, continued to retain possession and control of the assets.

non-insider creditors (such as Nortel and Burns) had executed on
the assets.  That is not a legitimate purpose.  *See Consumers
United*, 644 A.2d at 1358-59 (citing and quoting *Klein v. Rossi*,
251 F. Supp. 1, 2 (E.D.N.Y. 1966)) ("[F]raudulent purpose
includes a 'solvent person's deliberate effort to stave off
creditors by putting property beyond their reach even when the
purpose of that is not to cheat them of ultimate payment but only
to wrest from them time to restore the debtor's affairs'").

It is accordingly appropriate to enter partial summary
judgment avoiding the transfers to Comverge, Space, and Iceberg.

II

Malone further seeks to avoid the liens granted to Anderson
and FINDS.  Although Malone has demonstrated under the standards
for summary judgment that the transfers to Comverge, Space, and
Iceberg were fraudulent conveyances, he has not demonstrated,
under the standards for granting summary judgment, that the liens
granted to Anderson and FINDS were intentionally fraudulent
conveyances.  The analysis has been made difficult by Malone's
having failed to separately address the avoidability of the
transfers to Comverge, Space, and Iceberg versus the avoidability
of the transfers of liens to Anderson and FINDS.

A.  FACTS

Malone seeks to paint with a broad brush by treating Gold &
Appel's many transfers of assets and funds for no consideration

(and often as fraudulent conveyances) as necessarily
demonstrating that the conveyances of liens to Anderson and FINDS
were intentional fraudulent conveyances.  In support of this
effort at demonstrating fraudulent intent, he tosses into the
evidentiary pot various other circumstances: the transfers to
accounts held by Sylvia Rubio de Molina; the doubtful necessity
of Gold & Appel to enter into the transactions with Anderson and
FINDS; Anderson's disclaimer of any benefit from making his
loans; the disproportionately high value of the collateral versus
the debts owed to Anderson and FINDS; the receipt by Anderson and
FINDS of funds from Gold & Appel after their loans were made,
receipts for which no credit was given to Gold & Appel; and the
use of the 2002 Loan funds to pay obligations owed to Anderson,
FINDS, and other Anderson-controlled entities.  Those
circumstances could be viewed by a reasonable finder of fact as
only innuendo regarding fraudulent intent.  For the sake of
completeness (despite the unfortunate effect of adding to a
thicket of facts that is already quite dense), I will detail the
facts that Malone marshals in favor of these arguments.

    1.  TRANSFERS TO ACCOUNTS HELD BY SYLVIA RUBIO DE MOLINA

    Malone notes substantial transfers of Gold & Appel funds to
Sylvia Rubio de Molina ("Molina"), most of which occurred before
Gold & Appel incurred any of the debts to Nortel, Burns, and

FBW.[66]  Specifically, commencing in December 1998 and continuing
until early June 2000, Anderson transferred more than $20 million
out of Gold & Appel's bank account and into accounts at Krediet
Bank (Suisse) S.A. in Geneva, Switzerland.[67]  Swiss authorities
identified the holder of these Swiss bank accounts as Sylvia
Rubio de Molina, a Spanish national trained as an attorney.
Anderson had a personal and professional relationship with
Molina.

It is not clear what these transfers were for.  Anderson
claims that she "acted as a custodian of documents[] for the
Smaller World trust, the owner of Gold & Appel" and that she
provided "consulting and business connections" to Gold & Appel.
Anderson Decl. ¶ 43.  However, the transfers to Molina could not
have been compensation for serving as custodian of documents for
the Smaller World Trust, because the Custodian Agreement for
Smaller World Trust, dated February 9, 1996, states: "Silvia
Rubio de Mofina agrees that she **has already been compensated for
the first 5 years of Custodian services**."  Anderson Decl., Ex. AA
(emphasis added).  So for the years 1996 through 2000 ("the first

---

[66]  Malone has not sued Molina in this proceeding.

[67]  The transfers were as follows:

     Dec. 22, 1998 - $5,000,000
     Mar. 4, 1999  - $3,000,000
     May 13, 1999  - $1,844,503
     June 28, 1999 - $10,150,000
     June 7, 2000  - $570,074.01

5 years of Custodian services"), Molina had already been compensated for services as a Custodian.

Instead, in a June 2004 statement Anderson explained that the payment of $10,150,000 to Molina in June of 1999 was for services rendered to Esprit, a company in which Gold & Appel invested.[68]  However, Esprit was an independent company, and no documentation has been submitted to show that Gold & Appel was obligated to pay for services Molina rendered to Esprit. Anderson's interest in Esprit had ended long prior to June of 1999.  He has given no explanation why there was a long delay in making the payments to Molina if, indeed, Gold & Appel was compensating her for services rendered with respect to Esprit. Moreover, Anderson on deposition in July of 2004 testified that

---

[68]   Malone Decl., Ex. V.

Molina had not worked for Gold and Appel, and had no relationship to it.[69]

Not only is there no satisfactory explanation of why funds were transferred to Molina, but there is also no explanation regarding what happened to the funds transferred to Molina.  In being deposed by the Justice Department in December 2004, Molina appeared to disclaim any interest in the accounts into which the funds were transferred:

> Who the [sic] holders of the KREDITBANK SUISSE account?
> She states it is a matter of professional privilege.
> She is not an accountholder.

Malone Mtn. App. I, par. 17.

---

[69]  Malone Mtn. App. J.  On deposition examination by a Justice Department attorney in Spain on December 2, 2004, Molina herself stated she provided professional services to Anderson. Malone Mtn. App. I, par. 9.  Molina testified that after she and Anderson had met each other at a seminar in New York:

> He [Anderson] sporadically asked her specific questions relating, for example, to how to register a trademark, etc. . . . In 1995-1996 she started to charge professional advisory fees.  She started to do so because he asked her to be a custodian of documentation and also to advise him on investments he wanted to make.  She provided legal services to Mr. Anderson.
>
> . . . [In addition to serving as a custodian of documents], [b]efore 1996 she also acted at legal advisor on how to register trademarks, set up an office, labor issues, and hiring personnel here in Spain, but based on their friendship there is no record, or at least she doesn't have any documents attesting to that relationship.

Malone Mtn. App. I, par. 3.

All but one of the transfers to Molina occurred prior to the year 2000.  However difficult it may be to ascertain the true purpose of the transfers from Gold & Appel to Molina that occurred prior to 2000, I fail to see how they demonstrate that the subsequent transactions at issue here were fraudulent. Remember, Anderson admitted in pleading guilty to tax fraud charges that Gold & Appel had income of $327 million in 1998 and 1999 that he failed to report.  Malone has failed to show that in 1998 and 1999 Gold & Appel was not awash in huge amounts of funds, and has failed to show that the transfers to Molina prior to 2000 were not just a small fraction of Gold & Appel's funds. As long as Gold & Appel was left highly solvent when the pre-2000 transfers to Molina were made (a matter that Malone has not negated), Anderson was free to dispose of Gold & Appel funds as he saw fit unless he somehow intended the transfers to hinder, delay, or defraud creditors (again, something Malone has not shown).  So even if the payments to Molina preceding 2000 were only a gift (or were made to Molina for her to hold for Anderson), I fail to see how that demonstrates a fraudulent intent in Anderson's making those payments.

The transfer on June 7, 2000, of $570,074.01 to Molina came in the midst of Gold & Appel's *own* financial difficulties of incurring substantial obligations regarding NetTel that ultimately it could not honor.  Anderson has not specifically

asserted that *this* transfer was payment for services. Nor have invoices by Molina for services rendered to Gold & Appel been introduced as evidence. At the same time, however, Malone has not shown that this transfer left Gold & Appel unable to pay its debts. If Gold & Appel was entirely solvent and able to pay its debts, and if Anderson viewed Gold & Appel as able to pay its debts and harbored no intent to hinder, delay or defraud creditors via the transfer, Anderson was free to make a gift of $570,074.01 to Molina without it being a fraudulent conveyance.

Viewing the evidence in the light most favorable to Anderson and FINDS, the transfers to Molina were not intended to hinder, delay, or defraud any creditor, and do not establish a pattern of making fraudulent conveyances.

2.   RED TULIP

Malone's motion devotes considerable attention to a failed business venture, Red Tulip, LLC. Suffice it to say, I find the material facts in regard to Red Tulip to be in genuine dispute.[70]

---

[70]   Red Tulip was a company devoted to acquiring and developing an apartment building in New York City. The enterprise failed, with the apartment building being sold at foreclosure for less than the mortgage debt. Malone complains that Gold & Appel gave up an ownership interest in Red Tulip and converted that to a loan interest instead. (Anderson disputes that version of the facts and says that Gold & Appel was intended to be a lender from the outset.) Many a building enterprise proves unsuccessful, and Malone has not shown that an ownership interest in Red Tulip had any substantial value or that structuring Gold & Appel's interest as a lender instead of as an owner could have had any meaningful impact on Gold & Appel's creditors.

3.   THE TRANSFERS RELATING TO THE MADRID MANSION

After incurring the First Nortel Obligation and in the midst of incurring the Second Nortel Obligation, and during the time he was making the June 7, 2000, transfer of $570,074.01 to Molina, Anderson engaged in fraudulent conveyances of Gold & Appel funds used to purchase an improved property in Madrid, Spain (the "Madrid Mansion").  Between May 22, 2000 and July 28, 2000, Anderson caused Gold & Appel to transfer a total of $6,270,997.52 to himself and to certain affiliates or intermediaries, which funds were ultimately employed to purchase the Madrid Mansion. Anderson effected the transfer of funds used to purchase the Madrid Mansion by employing a series of Anderson-controlled affiliates of Gold & Appel, including Entrée and Iceberg.  In the period following the transfer of the funds used to purchase the Madrid Mansion, Anderson caused Gold & Appel's initial sole ownership of One World Properties, S.A., the entity that owned the Madrid Mansion, to be first diluted, and then transferred away, for the benefit of other Anderson affiliates, thereby effectively placing more than $6.2 million of Gold & Appel's funds beyond the reach of Gold & Appel's legitimate creditors. In the Madrid Mansion Order, this Court found that these transfers "were made with the actual intent to hinder, delay and defraud the creditors of Gold & Appel Transfer S.A."  Molina has

64

identified herself as an "administrator" of One World Properties, S.A.

Malone tries to suggest a fraudulent intent regarding the Anderson and FINDS liens by using their juxtaposition with the incurring of debts to Nortel and the fraudulent transfers regarding the Madrid Mansion.  The footnote below captures the essence of this attempt to taint the liens via association with the fraudulent Madrid Mansion transfers.[71]  Viewing the evidence in the light most favorable to Anderson and FINDS, a reasonable finder of fact could conclude that the liens were in exchange for reasonably equivalent value, that Anderson and FINDS gave up valuable assets in exchange for the liens, and that they obtained loan repayment obligations that were fair to Gold & Appel.  A

---

[71]  By April 20, 2000, the First Nortel Obligation for more than $8 million had come into existence.  On or about July 1, 2000, Anderson caused Gold & Appel to pledge substantial assets to himself for a $177,555 loan in the *2000 Loan Agreement* when Gold & Appel was facing liquidity problems.  Only 7 days before (on June 23, 2000), despite Gold & Appel's imminent liquidity problems, Anderson had transferred $5,650,000 from Gold & Appel to himself and Entrée ($2,825,000 to each of Anderson and Entrée) for the ultimate acquisition by One World Properties of the Madrid Mansion.  On July 17, 2000, the Second Nortel Obligation for more than $18 million came into existence.  On July 20, 2000, Anderson caused Gold & Appel to transfer an additional sum of $565,440.00 to One World Properties--now almost completely owned by Anderson and Entrée rather than Gold & Appel--in connection with the acquisition of the Madrid Mansion.

As of August, 2000, when Anderson caused Gold & Appel to enter into the *FINDS Collateral Agreement*, Anderson and Entrée had received the $5,650,000 from Gold & Appel in connection with the ultimate acquisition by One World Properties of the Madrid Mansion, and One World Properties had received another $565,400 in connection with its acquisition of the Madrid Mansion.

reasonable finder of fact could conclude that these factors outweigh any hint of fraud urged by Malone based on the liens having been obtained close in time to the fraudulent Madrid Mansion transfers.

    4.  DEBATABLE NECESSITY OF THE ANDERSON AND FINDS LOANS

Malone questions whether the loans from Anderson and FINDS could have served any legitimate business purpose because around the time they were made, Gold & Appel had the ability to make several large payments to other entities.  Malone points out that the *2000 Loan Agreement* and the 2000 Collateral Agreement occurred while the transfers of funds to purchase the Madrid Mansion were being completed.  In addition, on or about July 17, 2000, Anderson caused Gold & Appel to advance $4,000,000 to MirCorp Limited ("MirCorp"), a company in which Gold & Appel held a 40% shareholder interest.  From this, Malone argues that the Anderson loan was unnecessary and simply an excuse to gain control of Gold & Appel assets.  Malone Mtn. at 38.  Anderson responds that Gold & Appel was under an obligation to make that transfer to MirCorp, and that's why Gold & Appel needed money from Anderson in July 2000.  Anderson Decl. ¶ 47.

Malone also questions the necessity of Gold & Appel's borrowing Covista shares from FINDS to use as collateral for the Burns Loan when Gold & Appel itself was scheduled as holding

Covista shares valued at $56,900.77.[72]  *See* List of Assets, Ex. A
to Limited Opp. (Dkt. No. 315, relating to the Madrid Mansion
claims).  That does not alter the fact that FINDS gave real value
to Gold & Appel in making the loan.  FINDS' loan of the Covista
shares placed those shares at risk, enhanced the assets Gold &
Appel had at its disposal, and resulted in FINDS' Covista shares
being liquidated by Burns as collateral pledged to him, sparing
Gold & Appel's Covista shares from that fate.  A reasonable
finder of fact could find that FINDS gave reasonably equivalent
value in exchange for the security interest it obtained.

     5.   HIGH RATIO OF VALUE OF ASSETS SERVING AS COLLATERAL
         VERSUS THE DEBTS SECURED THEREBY

    The value of the collateral securing the debts owed Anderson
and FINDS far exceeded the amount of such debts, according to the
List of Assets compiled by Anderson.  *See* Ex. A to Limited Opp.
(Dkt. No. 315, relating to the Madrid Mansion claims).  In
addition, according to Anderson, the purchase prices of the 20th

---

    [72]  On or about March 12, 2008, FINDS, along with other
Anderson affiliates and adversary proceeding defendants
Galactech, Space, Mircorp, Entrée, and Comverge, filed a Limited
Opposition to the Official Liquidator's Madrid Mansion Motion
(Dkt. No. 315 in this adversary proceeding) (the "Limited
Opposition").  Attached as Exhibit A to the Limited Opposition
was a "list of assets in the Smaller World Trust dated December
31, 2000" which, according to FINDS, "shows that [Gold & Appel]
had assets totaling over $387 million at the end [of 2000]."
Limited Opposition, p. 5.  Included in this list of Gold & Appel
assets is a line item for "Total Tel – (Covista) Equity" valued
at $56,900,777. See Malone Decl., ¶ 30 and Exhibit "X" thereto
(Limited Opposition and Exhibit).

century paintings that were part of the collateral posted to secure the FINDS debt amounted to $2,878,512.  Malone asserts that the value of the paintings was considerably in excess of the ultimate value of the pledged Covista stock, but Anderson disputes this.

I fail to see the relevance of these points.  Malone has not contended that the debts created by Anderson's and FINDS' loans were on unreasonable terms.  Moreover, the extent of a security interest securing repayment of a debt is capped by the underlying debt.  That a lender obtains a security interest in property worth far more than the debt owed it does not establish a lack of reasonably equivalent value.

For example, the values ascribed by Anderson to Gold & Appel's assets that served as collateral for the debts owed FINDS amount to $177 million whereas the debt now owed FINDS is less than $4 million.  This discrepancy proves nothing.  FINDS was entitled to obtain a security interest in as much collateral as it thought was warranted, and its lien was limited by the amount of debt owed to it.  If the repayment of FINDS's claim was secured by collateral of a value far in excess of the debt owed it, Gold & Appel would be entitled to the excess after satisfaction of FINDS' debt.  Malone similarly notes that in consideration of the loan of $177,555 under the *2000 Loan Agreement*, Gold & Appel transferred to Anderson assets he valued

68

on the List of Assets at more than $37,000,000.  For the same
reasons as in the case of the FINDS collateral, it does not
matter that the value of the assets serving as collateral for the
Anderson loans far exceeded the amount owed Anderson.

> 6.   ANDERSON'S DISCLAIMER OF A BENEFIT TO HIMSELF FROM
>      MAKING THE LOANS

Anderson disclaimed any benefit to himself from making the
loans to Gold & Appel.  Anderson testified in 2004 (when he was
still hiding the fact that he ultimately controlled the ownership
of Gold & Appel) that, although he had always managed Gold &
Appel, he was not entitled to take ownership of any Gold & Appel
asset.[73]  In the same testimony in July 2004, Anderson asserted
that he made this loan even though no benefit from any
preservation of Gold & Appel's assets would accrue to him, and
the so-called "beneficial owners" of those assets were not even
asked to advance funds to Gold & Appel.[74]  Although this shows a
lack of credibility on Anderson's part, I fail to see how this

---

[73]  Anderson Deposition, July 21, 2004, p. 425, line 15 - p.
426, line 18. App. N.  *See also* Anderson's Letter of September 9,
2002 (Chalmet Affidavit, ¶ 73 and Exhibit page 85 thereto) in
which he wrote: "[d]ue to existing agreements which I have with
Gold & Appel Transfer S.A., Iceberg Transport S.A. and the
ultimate beneficial owner [sic] of these organizations, I can not
[sic] have the collateral for these loans to be [sic] transferred
to me or any organization which I own."

[74]  Anderson Deposition, July 21, 2004, p. 422, line 7 - p.
423, line 8.  App. J.

proves a fraudulent intent on his part in obtaining liens in his favor to secure a loan made by him.

7.    TRANSFERS OF GOLD & APPEL FUNDS TO ANDERSON AND FINDS

Malone questions the genuineness of the Anderson and FINDS liens when these two entities had either already received funds from Gold & Appel when they made a loan, or received funds after they made a loan but the funds were not credited to the loan. After each of the two times that it incurred a $150,000 debt to FINDS, Gold & Appel made transfers to FINDS.  The ultimate total liability to FINDS exceeded $3 million, and the transfers that were made to FINDS (for which no credit was given against the debt owed to FINDS) fell well short of $3 million.[75]  The transfers were these:

- After incurring in August 2000 its first obligation to pay FINDS $150,000, Gold & Appel, in the period starting January 24, 2001, and ending May 14, 2001,

---

[75]  In 1998 and 1999, Anderson had caused Gold & Appel to transfer more than $2,000,000 to FINDS.  Because this was before Gold & Appel began to have financial difficulties, I view that as of no relevance as to whether Anderson was engaged in fraudulent conveyances as to the creditors of Gold & Appel.

transferred at least $400,000 to FINDS.[76]  There is no

explanation in the record for those transfers.

- After incurring in August 2001 its second obligation to

    pay FINDS $150,000, Gold & Appel thereafter transferred

    at least $213,000 in funds to FINDS.[77]

The transfers totaling $213,000 occurred during the period of

October 22, 2001, to July 31, 2002, all before the expiration of

the use of FINDS Covista shares as collateral for the Burns Loan.

There is no explanation in the record for those $213,000 in

---

[76]  Malone Affidavit , Ex. M, showing these transfers to
FINDS:

| | |
|---|---|
| 01/24/2001 | $100,000 |
| 02/12/2001 | $100,000 |
| 04/02/2001 | $100,000 |
| 04/09/2001 | $50,000 |
| 05/14/2001 | $50,000 |

[77]  Malone Affi., Ex. M, showing these transfers to FINDS:

| | |
|---|---|
| 10/22/2001 | $7,500 |
| 11/27/2001 | $11,000 |
| 12/06/2001 | $11,000 |
| 01/14/2002 | $3,800 |
| 01/29/2002 | $4,000 |
| 02/14/2002 | $1,000 |
| 03/26/2002 | $5,000 |
| 04/03/2002 | $2,500 |
| 04/04/2002 | $11,000 |
| 04/10/2002 | $11,000 |
| 05/15/2002 | $2,200 |
| 07/03/2002 | $2,000 |
| 07/31/2002 | $141,000 |

transfers.  Nevertheless, even if the transfers were set off against the $3 million debt owed to FINDS, the debt would not be satisfied.

In addition, during the period of June 23, 2000, to July 31, 2002, Gold & Appel made these transfers to Anderson:

```
06/23/2000      $2,825,000
12/06/2001         $50,000
07/31/2002        $145,000
```

The June 23, 2000, transfer of $2,825,000 to Anderson was only seven days before the execution on July 1, 2000 of the *2000 Loan Agreement* in which Anderson lent $177,555, but that $2,825,000 was ultimately used by One World Properties (an entity effectively owned and controlled by Anderson) in acquiring the Madrid Mansion.  As between Anderson and Gold & Appel, the $2,825,000 was not viewed as giving rise to a debt owed by Anderson to Gold & Appel, so that does not cast doubt on the genuine intent of Anderson and Gold & Appel to treat the July 1, 2000 loan as a genuine loan.  No explanation has been given for the other two transfers totaling $195,000.  That $195,000, however, is far less than what Gold & Appel owes Anderson.

   8.   USE OF THE FUNDS LENT UNDER THE 2002 LOAN AGREEMENT
        TO PAY OBLIGATIONS OWED ANDERSON, FINDS, AND ENTRÉE

Malone makes much of the fact that Anderson's loan to Gold & Appel pursuant to the *2002 Loan Agreement* funded contemporaneous payments by Gold & Appel to Anderson, FINDS and Entrée aggregating $502,000 that would otherwise have remained

72

unfunded.[78]  Anderson explains that he provided Gold & Appel with
funds needed by Gold & Appel to pay its obligations:

> and some of those obligation[s] were to me, to repay
> expenses which I had incurred on behalf of Golf [sic] and
> Appel.  Other obligations were to Entrée International
> for contractual consulting fees which had been incurred
> by Gold & Appel.  Some of these funds went to FINDS to
> repay a portion of Gold & Appel's obligation to that
> entity.
>
> The fees that Gold & Appel was obligated to pay to Entrée
> are detailed in the "CONSULTING AND MANAGEMENT SERVICES
> AGREEMENT BETWEEN GOLD & APPEL TRANSFER S.A. AND ENTRÉE
> INTERNATIONAL (Exhibit FF).   Entrée International
> expended funds for it's [sic] rent, salaries and other
> overhead which was related to managing the activities of
> Gold & Appel and Gold & Appel's investments.

Anderson was free to make a loan to his corporation in order for
it to meet expenses.  That the funds were used in part to pay
debts owed him, Entrée, and FINDS effectively made his loan a
restructuring of those debt obligations, plus an infusion of
additional funds to pay other debts.[79]  There is no evidence that
Anderson failed to respect the separateness from him of Gold &
Appel as a corporate entity.  Indeed, he went so far as to
maintain a charade that he was not ultimately in control of the

---

[78]  Malone Decl., ¶ 25 and Exhibit "M" thereto, entries for
July 31, 2002.

[79]  The payments left Gold & Appel obligated to Anderson
alone on the new loan (versus being obligated to three entities
beforehand).  As to the existing obligations, Anderson could have
left things the way they were, and demanded the posting of
collateral from Gold & Appel in return for forbearance by the
three entities.  That would be the equivalent of what actually
resulted.

ownership of the corporation, and I make that point to emphasize that his intent was to treat the loan as a genuine loan.

9.   FAILURE OF ANDERSON AND FINDS TO ENFORCE LIENS AND THEIR INTENTION TO RELEASE GOLD & APPEL FROM LIABILITY

Malone notes that no foreclosure proceedings, whether under applicable provisions of the Uniform Commercial Code or otherwise, have ever been commenced or completed with respect to any Gold & Appel asset pledged as security to Anderson and FINDS. That does not demonstrate that the liens were not genuine. Malone also notes that the *Iceberg Letter* stated that the "Agreement will relieve Gold & Appel of any continuing obligations to Walt Anderson and FINDS in relation to these specific obligations." Malone notes that Anderson acknowledges that the release of Gold & Appel was a gratuitous act, for which neither he nor FINDS received any consideration. Anderson Deposition, July 21, 2004, p. 455, lines 9-13. App. V. I fail to see how that helps Malone: any release of Gold & Appel was to its benefit. Moreover, as Anderson notes, the *Iceberg Letter* called for "a new loan agreement to be guaranteed by Iceberg Transport and secured by collateral interests in the new fund vehicles." Anderson and FINDS were not giving up the debt, but instead arranging for other entities (to whom Gold & Appel assets were to be transferred) to be substituted in place of Gold & Appel as owners of the collateral that would still secure payment of the debt. Moreover, as will be seen, once a formal consolidated note

74

and an agreement regarding allocation of the collateral were
entered into, Gold & Appel was still treated as a borrower.

B.   LAW

1.   ANDERSON'S STATUTE OF LIMITATIONS DEFENSE FAILS

Anderson argues that avoidance of his liens is barred by the
statute of limitations, but that argument fails.[80]  He argues
that the transfers to him of liens were made more than four years
before this adversary proceeding was brought and, as a
consequence, that the cause of action is extinguished by D.C.
Code § 28-3109.  That provision provides that, with respect to a
cause of action brought under D.C. Code § 28-3104(a)(1), the
cause of action is extinguished unless it is brought "within 4
years after the transfer was made or the obligation was incurred
or, if later, within 1 year after the transfer or obligation was,
or could reasonably have been discovered by the claimant[.]".
D.C. Code § 28-3109(1).  Transfers of unperfected security
interests are deemed to be made immediately before the
commencement of the action and consequently fall within the

---

[80]  Because the transfers to Comverge, Space, and Iceberg
were made less than four years before the commencement of this
adversary proceeding, the statute of limitations does not bar
Malone's claims to avoid those transfers.

75

statute of limitations.  *See* D.C. Code § 28-3106(2).[81]  Because
the security interests in the Transferred Assets were
unperfected, the transfers at issue fall within the statute of
limitations.

Moreover, even without looking to when the transfers are
deemed to have been made under § 28-3106(2), it is evident that
several of the transfers occurred within the four-year period

---

[81]  That provision provides:

For the purposes of this chapter:

(1) A transfer is made:

> (A) With respect to an asset that is real property
> other than a fixture, including the interest of a
> seller or purchaser under a contract for the sale
> of the asset, when the transfer is so far
> perfected that a good-faith purchaser of the asset
> from the debtor against whom applicable law
> permits the transfer to be perfected cannot
> acquire an interest in the asset that is superior
> to the interest of the transferee; and

> (B) With respect to an asset that is not real
> property or that is a fixture, when the transfer
> is so far perfected that a creditor on a simple
> contract cannot acquire a judicial lien otherwise
> than under this chapter that is superior to the
> interest of the transferee.

(2) If applicable law permits the transfer to be
perfected as provided in paragraph (1) of this section
and the transfer is not so perfected before the
commencement of an action for relief under this
chapter, the transfer is deemed made immediately before
the commencement of the action.

D.C. Code § 28-3106.

before the filing of this proceeding on May 16, 2005.  The

transfer of the interest in the claims involving WorldxChange

occurred on August 10, 2001, when the *FINDS Collateral Agreement*

was amended.  The transfers of the AAT shares and the Panztel

shares were made pursuant to the *2002 Pledge Agreement*, dated

July 28, 2002, which is well within the four-year limitations

period.

　　　　2.   MALONE HAS NOT SHOWN THAT THE LIENS ARE AVOIDABLE

　　　Malone asserts:

> A review of the incomplete Gold & Appel banking records
> provided to the Official Liquidator shows that there was
> no rational basis for Gold & Appel, which was owed
> substantial amounts by Anderson and FINDS at the time of
> the Transfers, to be borrowing any money from Anderson or
> FINDS.  For example, after the transfer by Anderson of
> more than $20 million in Gold & Appel cash to Swiss bank
> accounts, Gold & Appel's banking records show no less
> than $2,500,000 transferred from Gold & Appel to FINDS
> from December, 1998 through July, 2002 and approximately
> $3,100,000 transferred from Gold & Appel to Anderson
> during the period June, 2000 through July, 2002.
> Material Facts, ¶ 59.  Moreover, the "loan" by Anderson
> in July, 2002 was in all likelihood not from Anderson at
> all and primarily covered outstanding checks of Gold &
> Appel to Anderson and entities he owned and controlled.
> Material Facts, ¶ 70.

Malone Mem. at 37-38.  This argument must be rejected.

　　　First, Anderson's affidavit establishes that the loan *was*

from Anderson.  Although Malone questions the veracity of what

Malone calls Anderson's self-serving statements regarding the

genuineness of the July 2002 loan, Malone's attacks on Anderson's

evidence as self-serving raises, at best, issues of credibility

that must be reserved for trial.  Viewing the evidence in the

light most favorable to Anderson, a reasonable finder of fact

could conclude that the documents and evidence demonstrate that

Anderson indeed made the July 2002 loan, and could reject any

argument that funds for that loan more likely did not come from

Anderson.

Second, the argument regarding Anderson and FINDS being

liable to Gold & Appel appears to be that Anderson made huge

transfers of monies or other assets from Gold & Appel, and made

transfers to himself and to FINDS such that the transfers of

liens to them occurred when they were liable to Gold & Appel.

Yet Malone argues this in a conclusory fashion, without spelling

out the legal basis upon which such obligations could exist.

Moreover, a reasonable finder of fact could conclude that

Anderson and FINDS (even if possibly liable to Gold & Appel)

viewed themselves as able to decline to pay to Gold & Appel any

potential debts they owed to Gold & Appel that had not been

reduced to judgment, and to treat Gold & Appel as required to

borrow from them if it was going to immediately obtain the use of

their funds and property.

In any event, all that Malone's motion sought was a

determination that the granting of the liens was a fraudulent

conveyance.  Malone did not seek summary judgment on any claim

for money damages against Anderson and FINDS.  Without Malone

having sought a judgment for money damages against Anderson and FINDS, or having articulated a legal theory for imposing a judgment for such damages, the issue of damages has not been briefed in a way that the issue is framed in a procedurally regular fashion. I decline to take into account Malone's argument that Anderson and FINDS were indebted to Gold & Appel in deciding whether there was an actual intent to make a fraudulent conveyance.

Third, Malone's attacks on the fairness of consideration that Anderson and FINDS gave up in exchange for the transfers disregards the reasonably equivalent value of what Anderson and FINDS gave up in exchange for the obligations Gold & Appel incurred and for Gold & Appel's granting of liens to secure repayment of those obligations. Of course, "where actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given." *United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994). However, a relevant factor in determining whether a transfer was made (or an obligation was incurred) with actual intent to hinder, delay, or defraud a creditor is whether "[t]he value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." D.C. Code § 28-3104(b)(8). Viewing the evidence in the light most favorable to Anderson and FINDS, a finder of fact reasonably

79

could give heavy weight to the existence of reasonably equivalent value and conclude that the transfers of liens to Anderson and FINDS were not intentionally fraudulent.

Related to that issue of the effect of reasonably equivalent value, it bears noting that although some factors to be considered in determining whether there was an intent to hinder, delay, or defraud creditors in incurring obligations to Anderson and FINDS and granting them liens might weigh in favor of finding such an intent, a reasonable finder of fact could conclude that they are outweighed by the following considerations.  Viewing the evidence in the light most favorable to Anderson and FINDS, a reasonable finder of fact could conclude that Anderson and FINDS had accumulated assets of their own over time as to which Gold & Appel had no claim; that in dealing with Gold & Appel as creditors, they strove to maintain the corporate separateness of Gold & Appel from them; that they strove to document the terms of the obligations incurred to them by Gold & Appel; that the obligations incurred to them by Gold & Appel were for reasonably equivalent value; that in lending funds or putting their assets at the disposal of Gold & Appel, they subjected themselves to the risk of nonpayment; and that to guard against such nonpayment, it was prudent on their part to demand liens securing repayment.  In contrast to *Consumers United*, 644 A.2d at 1358, this is not a case in which all the facts point only to an intent of Anderson

80

and FINDS to defraud a creditor in obtaining liens from Gold &
Appel, with no pure motive being possible.  Accordingly, summary
judgment is not appropriate.

Malone further argues:

> [F]unds advanced by a transferee who participates in an
> intentional fraudulent transfer are not recoverable by
> such transferee nor can they offset the amounts
> fraudulently transferred.  *In re Spotless Tavern Co.,
> Inc.*, 4 F.Supp. 752 (D. Md. 1933); *Manufacturers Nat'l
> Bank v. Simon Mfg. Co.*, 123 N.E.340 (Mass. 1919);
> *Citizens Bank and Trust Co. v. Rockingham Trailer Sales,
> Inc.*, 221 N.E.2d 868, (Mass. 1966); *Sumpter v. U.S.*, 302
> F.Supp.2d 707 (E.D. Mich. 2004) (trust receiving
> property from a grantor as part of fraudulent conveyance
> not entitled to credit for taxes paid and improvements
> made to property if trust actively participated in the
> fraud). Significantly, in *Twyne's Case* Mich. 44 Eliz.
> (Star Ch. 1601), the court observes  ". . . fraud is
> always appareled and clad with a trust, and a trust is
> the cover of fraud."

Malone Mem. at 43.  FINDS, of course, did not make the fraudulent
conveyances regarding the Madrid Mansion or the fraudulent
conveyances to Comverge, Space, and Iceberg.  Anderson made those
transfers on behalf of Gold & Appel, but those transfers were
separate from the transactions whereby Anderson made loans to
Gold & Appel and received liens on various assets as security for
the loans.  The decisions Malone cites do not serve to defeat
Anderson's and FINDS' liens as obtained in intentionally
fraudulent transfers.

*Sumpter*, 302 F. Supp. 2d at 726-27, and *In re Spotless
Tavern Co.*, 4 F. Supp. at 755-56, lay out the general rule that a

conveyee who actively participated in a fraudulent conveyance is
not entitled, as against the conveyor's creditors when the
conveyance is set aside, to reimbursement for expenditures made
by it to preserve or enhance the value of the property.  Here,
the rule does not apply.  It is Anderson and FINDS--not Comverge,
Space, and Iceberg as conveyees of the fraudulent conveyances of
assets--who are asserting claims against those assets for loans
to Gold & Appel.  Those loans preceded by many months the
fraudulent conveyances to those three entities, and they were not
made to facilitate the conveyances.

In *Manufacturers' National Bank*, the Simon Manufacturing
Company transferred all of its assets to the Simon Coat Company
to protect the assets from the bank.  *Manufacturers' Nat'l Bank*,
123 N.E. at 343.  Wanting to maintain its credit with certain
merchandise creditors, the Simon Coat Company then paid the
merchandise creditors of the manufacturing company.  *Id.*  The
court found that the transfer of assets to the coat company was a
fraudulent conveyance, and that because the coat company
participated in the fraud, it was not allowed a credit for the
amounts it paid to the merchandise creditors.  *Id*. at 343.  In
that case, the conveyee of the fraudulently transferred assets--
the coat company--was denied a credit.  *Manufacturers' National
Bank* is distinguishable because Anderson's and FINDS' liens were
not obtained incident to furthering any fraudulent conveyance to

themselves.  Their loans were not made to enhance the value of the Madrid Mansion and preceded the transfer of assets to Space, Comverge, and Iceberg.  In making their loans to Gold & Appel, Anderson and FINDS did not act in any capacity as conveyees of a fraudulent conveyance seeking to accomplish or enhance the fraudulent conveyance.

Similarly, *Citizen Bank and Trust Company* is distinguishable because it pertains to a party who received the fraudulently conveyed asset and who sought credit for a payment it made to the conveyor in exchange for obtaining the fraudulently conveyed property.  The case deals with the fraudulent conveyance of a trailer home.  Bradbury sold the trailer to Rockingham Trailer Sales, Inc., who turned around and sold it to another party. *Citizens Bank & Trust Co.*, 221 N.E.2d at 870.  The court, in determining that the transfer from Bradbury to Rockingham was a fraudulent conveyance, found that Rockingham (the conveyee) was an "active participant in the fraud" and therefore was not entitled to any credit for the amount it paid Bradbury for the trailer. *Id.* at 870-71.  Here, Anderson's and FINDS' loans were not made to accomplish the fraudulent conveyances.

Anderson and FINDS obtained their liens as part of transactions with Gold & Appel that were wholly separate from the conveyances that this court has deemed fraudulent.  Therefore, Malone's argument--that Anderson's and FINDS' liens and the loans

83

they secure should be defeated as claims against Gold & Appel

because Anderson, at other times and in different transactions,

participated in fraudulent conveyances--fails.[82]

III

Orders follow.

[Signed and dated above.]

Copies to: All counsel of record;

Jean-Claude Chalmet
Representative of Space Incorporated S.A. and Entrée
International Limited
Flat 9, 26-27 Conduit Street
London, W1S 2XZ, UNITED KINGDOM

Jean-Claude Chalmet
President and Sole Director
Iceberg Transport, S.A.
53 Filonos Street, 183 35 Piraeus
GREECE

Mr. Bob Werb
Foundation for the International Non-Governmental
Development of Space
4539 Seminary Road
Alexandria, VA 22304

---

[82] This analysis does not address the different issue of
Malone's right to set off the amount owed Anderson by any amount
that Anderson owes Gold & Appel, an issue not before the court at
this juncture.